## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JAMF SOFTWARE, LLC, a limited liability company,<br><br>    Plaintiff,<br><br>        vs.<br><br>PRAKASH MAHARAJ, an individual; and KANDJI, INC., a corporation,<br><br>    Defendants. | Case No. |

## **VERIFIED COMPLAINT**

Plaintiff Jamf Software, LLC ("Jamf" or "Plaintiff"), for its Verified Complaint against Defendants Prakash Maharaj ("Maharaj") and Kandji, Inc. ("Kandji") (collectively, "Defendants"), allege as follows:

## **INTRODUCTION**

Jamf is a well-respected Minnesota-based employer that creates software to manage mobile Apple devices, which is marketed to businesses and government entities across the world. Over the past five years, Jamf has worked diligently to establish itself as a premier services provider in India. As part of these efforts, Jamf retained the services of Prakash Maharaj as its first salesperson in India in 2018. In this role, Mr. Maharaj was privy to Jamf's trade secrets including, among other things, customer information, contract bids, and Jamf's proprietary pricing structure. Unfortunately, Jamf recently discovered that Mr. Maharaj orchestrated and carried out a shocking scheme to steal confidential and trade secret information from Jamf. The appalling magnitude of Mr. Maharaj's unlawful misappropriation is staggering, as Jamf discovered that he *exported*

**350,000 files** containing the Company's most sensitive business information to a personal folder he titled "Traisitioning [sic] Out of Jamf."

Jamf has now learned that Mr. Maharaj, and Kandji who employs multiple people for the purpose of conducting business in Minnesota, is utilizing its trade secrets to solicit and steal Jamf clients. Defendants' actions have already caused, and will continue to cause, significant irreparable damages to Jamf and its operations.

## NATURE OF THE CASE

1.      This is an action for injunctive and monetary relief arising from (i) Mr. Maharaj's willfully and surreptitiously planned theft, misappropriation, and, with and on behalf of Kandji, use of Jamf's trade secrets and confidential information, which comprised the heart of Jamf's business throughout India and various other emerging markets; and (ii) breach by Mr. Maharaj of a contractor agreement and non-disclosure agreement – entered into between Jamf and Mr. Maharaj in connection with Jamf's retaining Mr. Maharaj's services as its first salesperson in India – that has enabled Defendants to selectively identify and poach Jamf's customers in India and other markets as part of Defendants' collective scheme to potentially co-opt Jamf's India, Middle East, and Africa business.

2.      Mr. Maharaj is a former service provider and Regional Sales Manager, India, of Jamf who previously oversaw Jamf's team of sales contractors in India.  He was Jamf's first salesperson in India.  In his role, Mr. Maharaj used Jamf's confidential information to develop and grow Jamf's sales network in India.

3.      In or around January 2023, as Jamf was setting up its corporate entity in India, it learned that Kandji had begun soliciting Mr. Maharaj to leave Jamf and join Kandji as its first employee in India, where it previously had no operations.

4.      One month before ending his relationship with Jamf, while his discussions with Kandji were ongoing, Mr. Maharaj began ***exporting hundreds of thousands*** of files containing confidential and proprietary information from Jamf's systems to his personal USB drive.  Days later he accepted a job with Kandji.  Despite having accepted a position with Kandji, Mr. Maharaj continued misappropriating Jamf's confidential and proprietary information throughout the month of July 2023, including during the final week of his relationship with Jamf and while he was on paid time off ("PTO").

5.      Following Mr. Maharaj's separation from Jamf, Defendants immediately began using the confidential and proprietary trade secret information Mr. Maharaj misappropriated to solicit work from Jamf's customers in India (actual and prospective) in complete disregard of his post-separation contractual obligations and applicable law.  Despite Kandji and Mr. Maharaj receiving cease-and-desist letters outlining Mr. Maharaj's misappropriation and his post-relationship contractual obligations Defendants have refused to return the unlawfully misappropriated Jamf information in their possession.

6.      Simply put, Defendants appear to be seeking an unearned head start on Kandji's operations in India and potentially other emerging markets by misappropriating Jamf's confidential information and trade secrets and exploiting Mr. Maharaj's knowledge of Jamf's customer relationships.  Indeed, Defendants have already exploited and undermined Jamf's pre-existing customer relationships by obtaining work from at least one of Jamf's customers in the short period since Mr. Maharaj resigned and have solicited numerous others, including customers actively engaged in renewal negotiations with Jamf.  This unfair competition is in direct violation of Mr. Maharaj's agreements with Jamf and applicable state and federal laws. Defendants should

be enjoined from engaging in further unlawful conduct and should be required to return Jamf's trade secrets.

7.      If Jamf does not obtain injunctive relief from the improper and unlawful actions of Defendants, it will continue to suffer devastating and irreparable harm, namely the continuing loss and/or weakening of its client relationships, loss of goodwill, and severe damage to its reputation as a leader in mobile device software management.

8.      Consequently, Jamf needs injunctive relief that will prevent Mr. Maharaj from continuing to breach his post-separation contractual obligations owed to Jamf, lead to Defendants' disgorgement of its trade secrets and confidential information, and put an end to Defendants' unfair competition against Jamf.

## **PARTIES**

9.      Plaintiff Jamf Software, LLC creates software to manage mobile Apple devices, which is marketed to businesses and government entities across the world.  It is a Minnesota limited liability company formed in Minnesota, with its principal place of business in Minneapolis, Minnesota.

10.     Defendant Prakash Maharaj is a former Jamf contractor and current employee of Kandji.  He is a citizen of India and resides in Mumbai City, Maharashtra, India.

11.     Defendant Kandji, Inc., creates software to manage mobile Apple devices.  Kandji markets its products and services to businesses and government entities in the United States, including Minnesota, and, as of August 2023, in India.  Kandji employs multiple individuals in the State of Minnesota for purposes of conducting business within the state and cultivating opportunities there. Kandji is a Delaware corporation formed in 2019, with its principal place of business in San Diego, California.

4

## JURISDICTION & VENUE

12.     This Court has subject matter jurisdiction over Jamf's claim arising under federal law for violation of the Defend Trade Secrets Act pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836, *et seq*., and supplemental jurisdiction of Jamf's state law claims under 28 U.S.C. § 1367.  In addition, this Court has subject matter jurisdiction over Jamf's state law claims under 28 U.S.C. § 1332(a) as there is complete diversity of citizenship and the amount-in-controversy exceeds $75,000, exclusive of interests and costs.

13.     This Court has personal jurisdiction over Mr. Maharaj based on the exclusive forum selection clause contained in his Service Agreement with Jamf. (*See infra*, Ex. A at ¶¶ 14.5, 16.6).

14.     This Court has personal jurisdiction over Kandji because, inter alia: (1) Kandji conducts business in the State of Minnesota; (2) employs individuals to work in Minnesota; (3) Kandji transacts business within Minnesota under the Minnesota Long Arm Statute, Minn. § 543.19; and (4) its tortious conduct has resulted in damage in Minnesota.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (3) because Mr. Maharaj consented to litigation here and because Defendants are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### *Jamf's Business*

16.     Jamf was founded in 2002 by former Apple systems administrator and devout Apple user Zach Halmstad after he noted the absence of technologies in existence to manage Apple computers for organizations utilizing them as part of their operations.  It was founded with the

mission to create top IT administrator tools, services, and resources for commercial, education, and government organizations.

17.     Building solutions exclusively for Apple products, Jamf produces Jamf Pro, a mobile device management (MDM) software that can also be integrated easily into existing support technologies.  Jamf Pro is a full-solution MDM system for Apple's range of products, including Mac, iPad, iPhone, and Apple TV.  It allows IT departments to enable devices in-house, remotely, or through end user initiation.  The software system allows IT departments to easily disseminate software, management profiles, and content to end users and offers remote and automated security protocols.  It also offers analytics and reporting features to ensure the system works optimally and to allow IT departments to detect potential problems before they arise. Additionally, Jamf offers a suite of security products designed to enable businesses to protect and secure both Mac and iOS devices from cyber threats.

18.     Over the course of the 21 years since its founding, Jamf has become the dominant provider of Apple software management services for businesses and governmental entities across the globe.  As of 2023, Jamf has approximately 73,500 customers and over 31.3 million Apple devices under management.  Its customer retention consistently exceeds 100%.

19.     Kandji was launched in October 2019.  Jamf and Kandji are direct, head-to-head competitors.  Adam Pettit and Mark Daughters, two of Kandji's founders, are well-known to Jamf. Both were originally introduced to Jamf when they worked for Interlaced LLC ("Interlaced"), a company founded by Mr. Daughters.  Interlaced became one of Jamf's sales partners in 2015. They sold Interlaced in 2018 to begin working on Kandji.

20.     Initially, Kandji was a bare-bones product focused merely on checking device profiles against known security baselines. Eventually, it attempted to build a more full-fledged

6

MDM product, thus entering direct competition against Jamf. Since that time, Kandji appears to have endeavored to grow its business by following Jamf to various emerging markets and trying to mimic Jamf's business moves in those markets.

21.     However, unlike Jamf, Kandji has not had a sales presence in India until it hired Mr. Maharaj in August 2023.  As explained in greater detail below, Kandji has now taken its efforts to mimic Jamf's business to new, and unlawful, extremes.

### *Jamf's Indian Operations*

22.     Jamf's global reach has expanded in large part due to its investments in key emerging markets, previously in Europe and most recently in India, the Middle East, and Africa. In particular, it identified India as being ideally suited for significant investment due to a variety of reasons, including client demand, India's status as a hub for technology business and development, its growing population, and Apple's success in the territory.

23.     Jamf's efforts to grow the Indian market commenced in 2018.  It spent the past five years developing relationships with customers, including resellers, end consumers, private businesses, and various government entities.  Jamf did so through a team of sales contractors it hired to market and sell Jamf's products and services in the country.

24.     The software sector is highly competitive and the products and services highly complex.  As a result, individuals who sell the products and services must be skilled not only in sales, but they must also possess significant technical knowledge.

25.     To ensure its salesforce has the requisite technical and sales skills, Jamf devotes extensive time and expense in training and supporting its sales professionals so they can successfully market and sell Jamf's products and services.  For instance, Jamf provides various

trainings related to sales strategies, confidentiality, and information security.  The trainings are provided to Jamf's contractors, including Mr. Maharaj.  The trainings include:

    a.  SDR Privacy Training;

    b.  Security Industry Basics;

    c.  Selling Security Training Series;

    d.  Information Security Awareness;

    e.  Apple Enterprise Management;

    f.  Global Data Privacy;

    g.  Annual training on protecting Jamf's confidential information titled "Protecting Our Data,"; and

    h.  Jamf certification courses, such as Jamf 100, Jamf 200, Jamf 300, and Jamf 370.

26.     Jamf's efforts in the country have been a great success as evidenced by the fact that its revenues in the country have grown ten-fold since 2019.

27.     Based on the successes of its five-year efforts in India, Jamf officially launched Jamf India Private Limited ("Jamf India") – its Indian entity – on August 1, 2023.

### Jamf's Confidential and Proprietary Trade Secret Information

28.     The software market for supporting and securing Apple devices is highly competitive.  While Jamf has been immersed in the market for decades, new competitors arise frequently.  A fundamental and critical part of Jamf's business therefore involves the creation, development, and maintenance of confidential and proprietary information regarding both Jamf's business (*i.e.*, its operations, the specialized services it provides to its customers, its software) and its customers.

29.     This information is used by Jamf's large, well-trained sales team to seek and secure new business and to provide service and support to existing and prospective clients. Its ability to identify the needs and preferences of existing and prospective clients, and to deliver products and services catering to those needs and preferences, is critical to both maintaining and growing its

business globally.  As a result, it has invested a substantial amount of money, time, and energy in identifying and evaluating clients and prospects, as well as developing and customizing products and services for those clients and prospects.

30.     In the course of dealings with clients and prospective clients, Jamf obtains valuable information, including how its clients and prospective clients operate, the identity and contact information for key client personnel, contract expiration and renewal dates, terms for contracts and proposals, price points for contract renewals, and product and service needs and preferences.  Jamf uses this information to develop, analyze, and compile various internal strategies and information, including, but not limited to, Jamf's marketing and business strategies, business leads and opportunities, sales and related financial data, proprietary pricing information, product specifications and functionality, work-around issues with Jamf's products and services, test case documents, and employee and contractor contact information.

31.     Jamf's client and prospective client information is maintained by Jamf on secure databases, including on Salesforce. The confidential information located on these secured databases is stored on servers located within the United States.

32.     Among the highly confidential and proprietary trade secrets on Jamf's secure databases is specific information regarding Jamf's "go to market" strategy for new and/or emerging markets such as India, the Middle East, and Africa, which includes unique pricing structures, different negotiated deals, and creative solutions for how to attract new business and compete with potential competitors in those markets; information regarding the identity and contact information for prospective and existing clients; detailed terms for contracts and proposals; contract expiration and renewal dates; sales quotes; pricing and discounting information; price points for contract renewals; client-specific needs and preferences, including work-around issues;

marketing and business strategies; business leads and opportunities; sales and related financial data; cost of goods information; product specifications and functionality, including specific issues and concerns with product functionalities and services, as well as related workaround and troubleshooting information; and supplier and consultant contact information.

33.     The databases also contain documents related to business opportunities carefully cultivated by Jamf. The documents include what specific clients are looking to purchase, product lists, sales leads (new, current, and prospective customers), sales stage histories, special pricing requests regarding Jamf's offerings, including instances where Jamf gave a client a discount or rebate.  The proprietary information contained on Jamf's secure databases are considered the "crown jewels" of Jamf's sales team worldwide.

34.     Jamf takes substantial precautions to safeguard the confidential and proprietary trade secret information contained in its secured databases.

35.     For instance, the databases are user authenticated and IP address protected through Okta's single sign-on.  Okta's single sign-on is an authentication method that enables users to securely authenticate with multiple applications and websites by using just one set of credentials. Otka's single sign-on allows Jamf to have one set of password security standards across multiple different applications.  This allows Jamf to set a high, consistent standard for password security because it uses Okta to monitor and enforce those standards across all applications managed by Jamf.

36.     The secure databases are also accessible only by certain individuals, from certain electronic devices, and only from certain locations or IP addresses.  Database authentication must also be changed every 90 days and users may not re-use their four most recent passwords.  If a user attempts to reset their password, they must first respond to a security question they previously

setup. If a user attempts to login from an unrecognized IP address, a notification is automatically sent to another device previously authorized by the user before the device is permitted access to Jamf's secure databases. A security token is required for accessing Jamf's secure databases via a third-party application for integration, such as Microsoft Excel or Outlook.

37.     Additionally, access to the secure databases is limited to only those individuals who have a legitimate need for the information to effectively carry out their specific job duties.

38.     Further, Jamf requires any individual to execute a confidentiality agreement before granting them access to Jamf's secure databases. For example, contractors such as Mr. Maharaj are required to execute a contractor agreement containing confidentiality provisions prior to being given authorization to access the secure databases. Jamf also requires contractors to execute separate Non-Disclosure and Intellectual Property Assignment Agreements ("NDA") that also contain confidentiality provisions.

39.     All contractors are also required to attend and complete annual training titled "Protecting Our Data." Mr. Maharaj received this annual training on five separate occasions, most recently on May 23, 2023.

40.     Jamf's trade secrets are not readily ascertainable by other persons who could, if aware of this information, obtain economic value from their disclosure or use. Jamf takes, and continues to take, substantial precautions to safeguard Jamf's trade secrets. They are not shared with, or otherwise ascertainable by, the public or others in the industry.

41.     Jamf does not disclose its confidential and trade secret information to individuals who have not executed confidentiality and/or nondisclosure agreements.

42.     The documents and information contained on Jamf's secured databases are utilized by Jamf to carry out its business and effect sales across state lines and in foreign countries.

43.     The confidential information and materials described above constitute legally protected trade secrets under the Defend Trade Secrets Act.  18 U.S.C. §§ 1836, *et seq*.

### *Mr. Maharaj's Services and Agreements with Jamf*

44.     Mr. Maharaj began working for Jamf in October 2018.  He was Jamf's first salesperson in India.  Mr. Maharaj was retained to perform business development and sales services in India as a crucial part of Jamf's efforts to grow its presence in the Indian market.  Jean-Francois Lesseliers, Jamf's Director, Regional Sales, supervised Mr. Maharaj and the remainder of the Indian market sales team from Jamf's offices in Amsterdam, the Netherlands.

45.     His initial role was as an Account Executive.  In or around April 2020, Mr. Maharaj was promoted to Senior Account Executive.  He was promoted once more to Regional Sales Manager, India, in January 2021.

46.     As Regional Sales Manager of India, Mr. Maharaj supported Jamf sales to all industry markets and customers in India. His prior approval was also necessary to provide price discounts to customers, so he had detailed knowledge of Jamf's pricing strategy, discounts, and customer history.  As one of the leaders of Jamf's efforts to foster relationships with customers in India and because of the level of technical knowledge necessary to do so, Mr. Maharaj was given access to Jamf's trade secrets, including the Salesforce Database.

47.     On October 19, 2018, as part of his relationship with Jamf and for the specific purpose of safeguarding Jamf's confidential, proprietary, and trade secret information and materials, and also its goodwill, Mr. Maharaj entered into a Service Agreement ("2018 Service Agreement").

48.     On June 4, 2020, as a result of an increase in his compensation, Mr. Maharaj entered into a revised Service Agreement ("2020 Service Agreement") (collectively, "Service

Agreements"). The Service Agreements are collectively attached hereto as Exhibit A. The Service Agreements are virtually identical with the exception of the terms regarding Mr. Maharaj's compensation.

49. Under the Service Agreements, and in exchange for his access to Jamf's confidential secured databases and other trade secret information, his continued relationship with Jamf, increased monetary compensation and other benefits, Mr. Maharaj agreed that he would "at all times act in the best interests of the Company" and that he would "not engage in any acts or deeds such that would be detrimental to the interests of the Company." (Ex. A. at ¶¶ 4.2; 4.8 ).

50. To allow Mr. Maharaj to effectively perform his services, Jamf allowed him to access and utilize Jamf's trade secrets, as set forth above.

51. As Maharaj acknowledged in the Service Agreement, Jamf's (and its customers') trade secrets, confidential information, and other proprietary information, which he would be (and was) given access to, included, but was not limited to, the following information:

(i) Any and all software programs, derivative works, products and other results of the Services performed by [you] under this Agreement…

(ii) Any and all technical information of the Company or its customers, including, without limitation, product data and specifications, requirements, methodologies, tools, know-how, formulae, the source code, and other software information, processes, inventions, research projects, and product development;

(iii) Any and all business information of or relating to the Company or its customers that is not known to the general public, including, without limitation, accounting and financial information, sales and marketing information, research, investment analyses, investment strategies and techniques, investment transactions and holdings, clients…and information concerning "know-how" and information, data and material used or licensed by the Company or its customers, including, but not limited to computer software, programming, research, financial information and analyses, and the like documentation relating thereto;

(iv) Any and all employee information of the Company;

13

(v)     Confidential information disclosed to the Company by any third party, including its customers to which [you] ha[ve] access to; and

(vi)    Any personally identifiable information relating to the Company and its customers as made available during the performance of Services hereunder.

(Ex. A at ¶ 9.1(i)-(vi)).

52.     He further acknowledged and agreed that "the Confidential Information constitutes valuable trade secrets of the Company or its customers, as the case may be." (*Id.*).

53.     Mr. Maharaj agreed not to disclose any of this information to any third party and also not to use any of it "for any purpose other than for the performance of Services for the Company." (*Id.* at ¶ 9.2).

54.     Mr. Maharaj also agreed to return all such information to Jamf promptly upon termination of the Agreement and acknowledged his confidentiality obligations would survive termination of the Agreement. (*Id.* at ¶¶ 8.2.4, 9.2, 9.5).

55.     Mr. Maharaj agreed that in the event of a breach or threatened breach of the agreement, Jamf would "suffer irreparable harm and will be entitled to injunctive relief to enforce this Agreement." (*Id.* at ¶ 16.6).

56.     On January 21, 2021, Mr. Maharaj executed an amendment to the 2020 Service Agreement ("Amendment"). The Amendment was entered into as a result of another increase in Mr. Maharaj's compensation and did not affect any of his confidentiality obligations.  A copy of the Amendment is attached hereto as Exhibit B.

57.     The Amendment contained a choice of law provision selecting the laws of Minnesota to govern any dispute between the parties. (Ex. B at ¶ 4).  In the Amendment, Mr. Maharaj agreed to submit to the exclusive jurisdiction of the federal or state courts located in

Minnesota and also for Jamf's right to institute an action in a court of proper jurisdiction for injunctive relief at any time.  (*Id.*).

58.    On February 4, 2022, Maharaj also executed the NDA.  The NDA was executed by Mr. Maharaj after completing Jamf's annual "Protecting our Jamfs" and "Protecting our Data" training courses.  The training courses involve a review of Jamf's Code of Conduct and covers various topics, including, but not limited to, privacy and confidentiality and protecting Jamf's assets.  A copy of the NDA is attached hereto as Exhibit C.

59.    Similar to the Service Agreement, the NDA contains prohibitions against Mr. Maharaj's unauthorized retention and use of Jamf's confidential information both during and after termination of the parties' relationship.

60.    Specifically, the NDA provides that upon termination of the Service Agreement for any reason, Mr. Maharaj shall promptly deliver to Jamf:

> all computers, zip drives, storage devices, iPhones, iPads….records…documents, letters, reports, data, tables, tables, calculations and all copies of any of the foregoing which are the property of the Company or which relate in any way to the customers, business, practices or techniques of the Company; and
>
> all other property of the Company and Confidential Information which in any of these cases are in [Mr. Maharaj's] possession or under [his] control.

(Ex. C at ¶ 2).

61.    The NDA defines "Confidential Information" as information relating to the "business, products, and affairs of the Company, its affiliates, and its customers, from which [Jamf] derives benefit or economic gain and is not known publicly…unauthorized use or disclosure of which would harm the Company…."  (*Id.* at ¶ 1).  The NDA further defines this information as including, but not limited to:

> the identity, business, and needs of the Company's customers; the identity of and plans for the development of new customers by the Company; the

15

> business and pricing policies and practices of the Company; the financial condition and affairs of the Company; the Company's business development activities and plans for its existing and prospective lines of business, products, and services; the identity of and nature and terms of Company's business relations with customers, vendors, lenders, independent contractors and employees; any data or information that concerns any software development or coding performed by the Company; marketing and sales strategies of the Company; Company's…computer software and databases, systems, methods, programming materials, processes, new and developing products, services, and promotion campaigning concepts…form documents including quotes, invoices and purchase order.

(*Id.*).

62.     Mr. Maharaj also agreed that during the term of his association with Jamf, and all times thereafter, he would not use the confidential and trade secret information on behalf of, nor divulge it to, any third-party except as required or permitted by Jamf.  He agreed to return to Jamf all such information, on any medium whatsoever, when his relationship with Jamf concluded. (*Id.*).

63.     As with the Service Agreement, Mr. Maharaj agreed that to "enforce or prevent violations" of the NDA, Jamf may apply to a court of competent jurisdiction for, among other things, injunctive or other relief…" or require him to "account and pay over to [Jamf] all compensation, profits, monies, or other benefits derived or received by [Mr. Maharaj] as a result of the breach…."  (*Id.* at ¶ 5).

64.     Finally, he agreed the NDA would be governed by Minnesota law and that he would be subject to jurisdiction there.  (*Id.* at ¶ 6).

### *Mr. Maharaj Ends Relationship with Jamf*

65.     In January 2023, Mr. Maharaj notified his supervisor, Mr. Lesseliers, that Kandji had contacted him on LinkedIn to discuss becoming its first salesperson in India.

66.     In April 2023, Mr. Maharaj informed Mr. Lesseliers that he was no longer discussing potential employment with Kandji.  As Jamf would later learn, Mr. Maharaj's assurance was false.

67.     Jamf was alerted to the fact that Kandji was courting Mr. Maharaj by a colleague who works with one of Jamf's business partners.  The colleague forwarded an email to Jamf that he had received from Steve Sutcliffe, a Vice President for Kandji.  In the email, Mr. Sutcliffe mentioned that Kandji was in discussions with Mr. Maharaj concerning his potential to be its first employee in India.

68.     At the end of June 2023, Jamf provided Mr. Maharaj – and its other sales contractors in India – with a written offer of employment with Jamf India in the form of a proposed employment agreement.  Mr. Maharaj's service with Jamf was scheduled to conclude on July 31, 2023, and under the proposal, his employment with Jamf India would commence on August 1, 2023.

69.     However, on July 7, 2023, Mr. Maharaj notified Jamf that he was declining Jamf's offer of employment, meaning the parties' relationship would terminate on July 31, 2023.

70.     On August 3, 2023, Mr. Maharaj e-mailed Mr. Lesseliers and confirmed that he had accepted a position with Kandji as its Sales Director for India, a role that was substantially the same position that he had previously held with Jamf.

### *Maharaj's Unlawful Misappropriation of Jamf Trade Secrets and Confidential Information*

71.     On the surface, Mr. Maharaj's last month of service with Jamf appeared uneventful.  In fact, Maharaj took PTO for his final contracted week of work (July 24 through July 28).  However, Jamf later became aware that Mr. Maharaj might be joining its direct competitor Kandji.

72.     Jamf therefore engaged its Security Operations ("SecOps") group to investigate Mr. Maharaj's activity on his company-issued devices.  The investigation revealed that in the days and weeks leading up to his separation from Jamf, Mr. Maharaj engaged in an unprecedent level of economic espionage and theft of trade secrets, having downloaded, copied, and retained a substantial amount of confidential and proprietary information related to Jamf's business, including information from its Salesforce and other secure databases without authorization.

73.     To conduct the investigation, SecOps utilized the monitoring function within Jamf Protect, one of its software products, to determine whether Mr. Maharaj unlawfully exported Jamf documents and information to a personal storage device and also whether he took screenshots of sensitive information.  Jamf Protect reported that Mr. Maharaj's device transferred screenshots to a personal USB device.  Splunk reported the same screenshot and transfer activity, which was further correlated by the filesystem backup provided by IT to SecOps.  SecOps reviewed this filesystem backup as part of its investigation.   Splunk is a software tool used by the SecOps team to search, monitor, and analyze machine-generated data via a web-style interface.  Jamf uses Splunk as a security incident event monitoring and investigation tool to centralize event logs across systems.

74.     This part of the investigation showed that Mr. Maharaj had indeed taken 650 screenshots on his MacBook, including of Jamf's confidential and proprietary information stored on one or more of Jamf's secured databases in the weeks leading up to his departure from Jamf. Hundreds of these screenshots were determined to have been taken within the last few days of his tenure with Jamf.  The screenshots taken by Mr. Maharaj included, but are not limited, to:

    a.  Jamf's pricing information for customer(s) that Mr. Maharaj worked on for Jamf;

    b.  Jamf's report of customer names and value of their bookings for a particular Jamf market that Mr. Maharaj worked on for Jamf;

     c.   Jamf's August 2023 quotes for customer(s) showing pricing, volume, and channel discounts; and

     d.   Over 150 screenshots of Jamf's presentation for the Jamf 300 course.

75.    SecOps' investigation also looked into USB activity as a potential method for how Mr. Maharaj could have misappropriated Jamf's confidential and trade secret information in conjunction with his departure from Jamf and new employment with Kandji. The SecOps team investigated the USB activity by investigating logs from Jamf Protect for screenshots taken on the user's MacBook, Splunk for file copy events, and a loading of the backup received by IT to confirm the contents of files by filename.

76.    SecOps discovered that Mr. Maharaj created a folder on his Jamf-issued MacBook titled "Traisitioning [sic] Out of Jamf," moved Jamf's confidential and proprietary documents and information to the folder, and ultimately exported the documents and information to a personal USB device that he took with him to Kandji following his last day working for Jamf. SecOps determined Mr. Maharaj initially created the "Traisitioning [sic] Out of Jamf" folder on June 30, 2023.

77.    In addition to the files exported from the "Traisitioning [sic] Out of Jamf" folder, Mr. Maharaj also exported files from his desktop to his personal USB device. These files also included Jamf's confidential and proprietary documents, including customer lists and customer-specific presentations.

78.    The severity and significance of Mr. Maharaj's actions was only heightened when SecOps discovered the scope of Mr. Maharaj's USB activity. SecOps's investigation revealed that in the weeks leading up to his departure from Jamf, Mr. Maharaj downloaded or copied ***approximately 350,000 files*** to his personal USB device. Given the immense size of the exported data, SecOps believes Mr. Maharaj copied his entire Jamf drive to his personal USB device.

79.     SecOps filtered the Splunk search to Mr. Maharaj's local user account.  In doing so, SecOps was able to confirm that Mr. Maharaj used his system credentials to log into his company-issued MacBook Pro 14 (identified by serial number QG7VFW1GPX) when the USB device was inserted into the MacBook before Mr. Maharaj exported the approximately 350,000 files to the USB device.

80.     Among the approximately 350,000 files unlawfully downloaded, exported, and retained by Mr. Maharaj are documents related to pricing information for customers, reports regarding customers and their bookings, quotes for customers, and more highly sensitive Jamf business information.  The majority of the documents and information stolen by Mr. Maharaj, relate to specific clients, sales divisions, and proprietary pricing information.  A sampling of the files stolen by Mr. Maharaj include, but are not limited to:

   a. "Jamf Channel SKU 1002020203", documents containing targeted information about how Jamf prices and sells various products;

   b. "Jamf Channel SKU 1002020103_001," same as above;

   c. "Jamf Channel SKU 9001020099-C", same as above;

   d. "Zoom Info Leads 2023 Q3", which is a list of Jamf's sales leads for Q3 or *the current quarter*;

   e. "Q3 India Security Open", which is a business pipeline list detailing open opportunities to sell Jamf security products for Q3 or *the current quarter*;

   f. "Q3 India All Open Opportunities", which is a list of all recent sales opportunities that Jamf is tracking in its India sales pipeline for Q3 or *the current quarter*;

   g. "Q3 Marketing Plan Consolidation";

   h. "India New Logo 2023," which is a list of Jamf's *new* customers;

   i. "Contacts w email 2023", which is a list of customers with contact information;

   j. "EMEIA Partner Contact List", which is a list of Jamf's business partners in Europe, the Middle East, India, and Africa;

   k. "India Customer Email Addresses", list of India specific customers with contact information;

l.  "EMER EDU-Commit & Won" Report, which is a report showing the education customers that Jamf had ***recently won*** in its emerging markets; and

m.  Various customer quotes.

81.     All of the documents and information misappropriated by Mr. Maharaj listed above constitute confidential and trade secret information under the terms of the Service Agreement and NDA.

82.     Mr. Maharaj's intentional misappropriation of Jamf's proprietary information is further highlighted by the fact that numerous exported files in the "Traisitioning [sic] Out of Jamf" folder are titled as "screenshots," "pricing," or specific customer names.  Leaving no doubt as to his intent to misappropriate the aforementioned confidential and proprietary trade secret information, Jamf's investigation suggests that Mr. Maharaj had actually executed an agreement to join Kandji on July 4, 2023.  ***Yet, SecOps investigation revealed that the vast majority of Mr. Maharaj's theft took place after that date.***

83.     Jamf's investigation also showed that Mr. Maharaj took the Jamf 300 course, a Jamf certification course that provides users a deeper understanding of the macOs and iOS management capabilities within Jamf Pro.  He took the course in the final days of his relationship with Jamf and weeks after he agreed to join Jamf competitor Kandji.  The Jamf 300 course has a written policy that expressly prohibits recording any part of the training and specifically bans sharing, copying, or reproducing images of training materials in any way.  Despite this express prohibition, Mr. Maharaj took numerous screenshots of the Jamf 300 course programming.  In fact, one of those screenshots is of the presentation page declaring that the course programming is confidential and proprietary to Jamf and recording is prohibited.

84.     Mr. Maharaj has misappropriated all of this confidential information and trade secrets (and more) and is now using it on behalf of, and possibly with Kandji's direction but

certainly its approval, as part of its efforts to unfairly compete against Jamf in India and elsewhere. The misappropriated information is incredibly important to Jamf's business success, its go-forward strategy in India and other emerging markets and are invaluable to its competitors. This information has been gathered through the significant expenditure of time, resources, and effort, Jamf has spent cultivating customer relationships in India and other emerging markets over the past five years. The insight Jamf gains from its ongoing dealings with its customers (actual and prospective) is invaluable, as evidenced by the fact that Jamf's customer retention rate is routinely greater than 100%.

85.     The documents and information Mr. Maharaj misappropriated are also valuable because they contain: the identity and contact information for prospective and existing clients; detailed terms for contracts and proposals; contract expiration and renewal dates; sales quotes; detailed pricing information; price points for contract renewals; client-specific needs and preferences including work-around issues; marketing and business strategies; business leads and opportunities; sales and related financial date; cost of goods information; product specifications and functionality, including specific issues and concerns with product functionalities and services, as well as related workaround and troubleshooting information; and supplier and consultant contact information.

86.     Further, the misappropriated information is valuable to Jamf because they contain information: about what specific products various clients are in the market to buy; product lists; sales stage history; and sales pipeline information and leads (new, current, or prospective customers); and special pricing requests showing Jamf products and services and instances where a discount may have been given, among other valuable business information.

87.     The Jamf confidential and proprietary information described above is not generally known to the public or the industry in which Jamf operates.  As a result, if a competitor, like Kandji, becomes privy to this unlawfully misappropriated material, it would be at a significant, unearned advantage in the highly competitive MDM and security software market.  In the hands of a competitor, like Kandji, the customer and pricing information alone would be devastating to Jamf's operations in India and other emerging markets.  It would allow a competitor to easily identify customers in the market for the types of services provided by Jamf and Kandji and allow Kandji to outbid Jamf by knowing the exact pricing Jamf is charging customers and the products the customers already use or are interested in purchasing.

### *Defendants' Use of Jamf's Trade Secrets to Identify and Solicit Jamf's Customers*

88.     Upon information and belief, Kandji had knowledge of Mr. Maharaj's plan and encouraged him to misappropriate and utilize Jamf's confidential and proprietary information to further its own business interests.

89.      Defendants have used and disclosed those Trade Secrets without Jamf's consent and without regard to Jamf's rights, and without compensation, permission, or licenses for the benefit of itself and others.  Defendants' conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Jamf's valid and enforceable rights.

90.     By and through their theft of Jamf's trade secrets, Defendants deliberately intended to disrupt and have disrupted the business relationships between Jamf and its customers in the Indian market.

91.     Upon information and belief, Defendants have in fact relied upon confidential information stolen by Maharaj in furthering Kandji's business interests.

92.     While Jamf's investigation remains ongoing, it is aware of multiple customers who have been solicited by Mr. Maharaj on behalf of Kandji in the short time he has been employed there.

93.     For example, Mr. Maharaj was part of the commercial sales team that secured a deal for two of the customers in 2019.[1]   Jamf has been and is currently in renewal negotiations with the Renewal Customers.   When departing Jamf for Kandji, Mr. Maharaj was aware of the details of the renewal negotiations, including Jamf's renewal strategy, the renewal terms offered by Jamf, and historical information Jamf had compiled regarding the Renewal Customers. Importantly, Renewal Customer A and Renewal Customer B were included in a customer list that was downloaded and exported by Mr. Maharaj to his personal USB device, as were documents related to Jamf's strategy for renewal discussions with the customers.   Jamf has learned that Mr. Maharaj has called on and actively solicited these customers on behalf of Kandji since departing from Jamf.

94.     Jamf is also aware of numerous prospective customers that Mr. Maharaj has solicited on behalf of Kandji. Mr. Maharaj has used the unlawfully misappropriated confidential information to solicit prospective customers that Jamf had been actively negotiating with for many months.[2]   Proprietary information concerning Prospective Customer A's detailed pricing information was included in the files that Mr. Maharaj unlawfully downloaded and exported.

---

[1] For confidentiality purposes at this stage, Jamf will refer to these customers as "Renewal Customer A," "Renewal Customer B" and, collectively, "Renewal Customers." Jamf is willing to disclose the specific names of the customers once a protective order has been entered.

[2] For confidentiality purposes, this prospective client will be referred to as "Prospective Customer A." Jamf is willing to disclose the specific names of the customers once a protective order has been entered.

95.     Further, Kandji recently won a new account for Prospective Customer B by slightly underbidding Jamf.[3]  The information Mr. Maharaj unlawfully misappropriated included Jamf's pricing information for Prospective Customer B, and it is not a coincidence that Kandji submitted a bid and won this account by such a small margin *just days after* Mr. Maharaj joined Kandji as its first salesperson in India.  Thus, it is all but certain that Mr. Maharaj (and Kandji) is using Jamf's misappropriated trade secret information to aid Mr. Maharaj's efforts to solicit these customers on behalf of Kandji.

96.     Though Jamf's investigation remains ongoing, it is aware that Mr. Maharaj misappropriated proprietary information related to at least 20 other customers. That number is expected to rise as Jamf continues its forensic investigation.  It is likely, if not certain, that Mr. Maharaj has engaged in further customer solicitation in violation of his contractual and legal obligations and will continue to do so absent judicial intervention.

97.     Mr. Maharaj's conduct is a blatant violation of the confidentiality provisions in the Service Agreement and NDA.

### Defendants Refuse to Return Jamf's Misappropriated Trade Secret Information or Require Mr. Maharaj to Comply with his Contractual Obligations

98.     On August 8, 2023, Jamf (through its counsel) sent Mr. Maharaj a letter reminding him of his contractual obligations, Jamf's ongoing investigation, and the results of the investigation to date.  Jamf requested numerous assurances from Mr. Maharaj, including, but not limited to:

    a.  Written confirmation of his understanding that he is prohibited from using Jamf's confidential information or trade secrets that he obtained while under contract with Jamf;

    b.  Written confirmation of his understanding that he was not allowed to solicit Jamf customers on behalf of himself or Kandji;

---

[3] For confidentiality purposes, this prospective client will be referred to as "Prospective Customer B." Jamf is willing to disclose the specific names of the customers once a protective order has been entered.

    c.    A list and description of any Jamf documents and materials that he had shared with anyone at Kandji or that he had used to further his work for Kandji; and

    d.    Written assurance that he would cooperate with Jamf to immediately return the confidential information and trade secrets.

99.     Mr. Maharaj responded to Jamf via email on August 10, 2023. In his response, Mr. Maharaj confirmed that he was aware of his post-separation obligations and did not deny that he downloaded, copied, and retained hundreds of thousands of Jamf documents and information in the days leading up to his separation from Jamf. However, he refused to confirm that he would return or destroy all Jamf information in his possession.

100.     Jamf (through its counsel) also sent Kandji a letter on August 8, 2023, informing (or reminding it) of Mr. Maharaj's contractual obligations, Jamf's ongoing investigation, and its discovering that Mr. Maharaj had illegally downloaded, copied, exported, and retained hundreds of thousands of files containing Jamf's confidential and proprietary information. The letter also detailed how Mr. Maharaj was using Jamf's information to solicit customers for the benefit of Kandji.

101.     Jamf also requested certain assurances from Kandji, including confirmation as to whether it was aware of Mr. Maharaj's contractual obligations, confirmation that it would not interfere with those obligations, and confirmation that it had searched its systems and the email of its employees and contractors and confirmed that no Jamf documents or materials were in its possession, and confirmation that it would require Mr. Maharaj to disgorge himself of all Jamf information in his possession.

102.     Two days later, Kandji (thorough its internal counsel) responded via email. Remarkably, and despite the sheer egregiousness of its employee's misconduct, Kandji merely confirmed receipt of the letter, that it was reviewing the matter, and that it would respond "next

week" at its leisure.  That same day, Jamf (through its counsel) expressed its dissatisfaction with the non-substantive response.  It reminded Kandji that Mr. Maharaj had downloaded and exported more than 350,000 documents and was actively using its trade secret information to solicit and steal clients for Kandji.  Jamf further advised Kandji that without a satisfactory and substantive response by Monday, it would be forced to take legal action.

103.    The Monday deadline passed without a response from Kandji.  To date, neither Mr. Maharaj nor Kandji have returned any of the more than 350,000 documents that were misappropriated by Mr. Maharaj.  As a result, Jamf was left with no option but to protect its legitimate business interests through this legal action.

### *Injunctive Relief is Necessary to Preclude Further Irreparable Harm*

104.    Despite Jamf's demands and the overwhelming evidence of unlawful conduct even at this nascent stage of Jamf's investigation, Defendants continue to conduct in the breaches and tortious activity set forth herein.  Defendants' cavalier attitude regarding this egregious misconduct highlights the immediate need for judicial intervention in the form of injunctive relief.

105.    Defendants' actions have caused and will continue to cause Jamf irreparable and substantial harm in its business, business reputation, goodwill, and relations with its customers and prospective customers.  Unless restrained and enjoined by this Court, Defendants will continue their unlawful and unfair business practices, and Jamf will continue to suffer harm that is difficult to detect or measure and irreparable.  Injunctive relief is the appropriate remedy to prevent Defendants from engaging in any further unfair competition as herein alleged.

### FIRST CLAIM FOR RELIEF
#### Breach of Contract (Confidentiality)
#### (Against Maharaj)

106.    Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1

through 105 as if fully set forth herein.

107.    Mr. Maharaj signed and agreed to abide by certain confidentiality obligations in the Service Agreements, which included his agreement not to disclose any of Plaintiff's confidential information to any third party and not to use any of it "for any purpose other than for the performance of Services for the Company."   He further agreed that the confidentiality obligations "shall survive any expiry or termination of this Agreement…."  (Ex. A at ¶¶ 9.2, 9.5).

108.    Mr. Maharaj also signed and agreed to abide by certain confidentiality obligations in the NDA, which included him agreeing that "during the term of his[] association with Company, and at all times thereafter" he would not "use or not directly or indirectly make known or divulge the Company's Confidential Information to any others except as required or permitted by the Company in the course of its business…."  (Ex. B at ¶ 2).

109.    The aforementioned agreements are valid and enforceable and were all supported by valid consideration, namely, Mr. Maharaj's retention, access to Jamf's confidential information and trade secrets, and increases in compensation.

110.    Plaintiff performed its obligations under the agreements by providing Mr. Maharaj with access to its confidential and proprietary information and also by compensating him for his services.

111.    By their express terms, Mr. Maharaj's confidentiality obligations survive his separation from Jamf.

112.    Mr. Maharaj breached the confidentiality obligations by improperly accessing, downloading, and disclosing vast amounts of confidential information regarding Jamf's business and its customers, and other proprietary and restricted information.

113.    As a result of Mr. Maharaj's breaches of the agreements, Jamf has suffered

28

damages, including, but not limited to, lost business revenues and loss of goodwill.

## SECOND CLAIM FOR RELIEF
### Breach of Contract (Return of Property)
### (Against Maharaj)

114.    Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 113 as if fully set forth herein.

115.    By executing the Service Agreements, Mr. Maharaj agreed that in the event of termination of the agreement, he would return Jamf's "documents, in particular all materials and documents concerning trade secrets and other business information (including but not limited to databases, lists, information and documents pertaining to the Company's customers…) that was prepared, gathered or obtained during the term of this Agreement…."  (Ex. A at ¶ 8.2.4(i)).

116.    Similarly, in the NDA, Mr. Maharaj agreed that "upon termination of his Service Agreement…[he] will return to the Company all Confidential [I]nformation, on any medium whatsoever, and all other property of the Company or Company's clients."  (Ex. B at ¶ 2).

117.    The aforementioned agreements are valid and enforceable and were all supported by valid consideration, namely, Mr. Maharaj's retention, access to Jamf's confidential information and trade secrets, and increases in compensation.

118.    Plaintiff performed its obligations under the agreements by providing Mr. Maharaj with access to its confidential and proprietary information and also by compensating him for his services.

119.    Mr. Maharaj breached his contractual obligations to return the Company's property by improperly retaining vast amounts of confidential information and trade secrets regarding Jamf's business and its customers, as well as other proprietary and restricted information.  He did so despite Jamf explicitly demanding he return the property.

120.     Rather than returning Jamf's property, Mr. Maharaj has instead misappropriated the documents and information contained therein on behalf of Jamf's direct competitor, Kandji.

121.     As a result of Mr. Maharaj's breaches of the agreements, Jamf has suffered damages, including, but not limited to, lost business revenues and loss of goodwill.

**THIRD CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act, 18 U.S.C. § 1836**
**(Against Defendants)**

122.     Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 120 as if fully set forth herein.

123.     The Defend Trade Secrets Act ("DTSA") provides a cause of action for misappropriation of trade secrets "related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

124.     During his relationship with Jamf, Mr. Maharaj was granted access to trade secrets, including, but not limited to, specific information regarding Jamf's "go to market" strategy for new and/or emerging markets such as India, the Middle East, and Africa, which includes unique pricing structures, different negotiated deals, and creative solutions for how to attract new business and compete with potential competitors in those markets; information regarding the identity and contact information for prospective and existing clients; detailed terms for contracts and proposals; contract expiration and renewal dates; sales quotes; pricing and discounting information; price points for contract renewals; client-specific needs and preferences, including work-around issues; marketing and business strategies; business leads and opportunities; sales and related financial data; cost of goods information; product specifications and functionality, including specific issues and concerns with product functionalities and services, as well as related workaround and troubleshooting information; and supplier and consultant contact information.

125.    This information constitutes trade secrets under the DTSA because it derives economic value from not being generally known or readily ascertainable through proper means by another person who can obtain economic value from the information, and because the information is the subject of reasonable efforts under the circumstances to maintain its secrecy.  18 U.S.C. § 1839(3).

126.    Jamf's trade secrets relate to products and services it markets and provides to clients across the United States and internationally.  The trade secrets misappropriated by Defendants are utilized by Jamf's sales team in interstate and foreign commerce to obtain sales and service customers. The trade secrets are used by Jamf to ensure its competitive advantage in marketing products and providing services to clients in the United States and internationally.

127.    Mr. Maharaj misappropriated the trade secrets from servers exclusively housed in the United States.

128.    Jamf takes reasonable precautions to safeguard the confidential and proprietary trade secret information contained in its secured databases.  The secured databases are user authenticated and IP address protected through Okta's single sign-on, allowing Jamf to set a high, consistent standard for password security because Jamf uses Okta to monitor and enforce those standards across all applications managed by Jamf.  The databases are accessible only by certain individuals, from certain electronic devices, and only from certain locations or IP addresses. Database authentication must also be changed every 90 days and users may not re-use their four most recent passwords.  Users are required to correctly answer a security question before they may reset their password.  If a user attempts to login from an unrecognized IP address, a notification is automatically sent to another device previously authorized by the user before the device is permitted access to Jamf's secure databases.  A security token is required for accessing Jamf's

secure databases via a third-party application for integration, such as Microsoft Excel or Outlook. Access to Jamf's secure databases is also limited to only those individuals who have a legitimate need for the information to effectively carry out their specific job duties. Jamf requires individuals with access to the secured databases to attend and complete annual training, which Mr. Maharaj attended as recently as May 2023.   Finally, Jamf also requires any individual to execute a confidentiality agreement before granting them access to Jamf's secure databases. Individuals are required to execute a Service Agreement that contains confidentiality provisions and a separate Non-Disclosure and Intellectual Property Assignment Agreement that also contains confidentiality provisions prior to being given authorization to access the secure databases.

129.   Mr. Maharaj had access to the Jamf Trade Secrets while serving as a Jamf contractor and under confidentiality obligations arising from his contractor agreements.   These agreements obligated Mr. Maharaj to maintain the confidentiality of the trade secrets and not to use them except for the benefit of Jamf.

130.   Defendants have used Jamf's trade secrets and confidential information to solicit Jamf customers (existing and prospective).   Trade secret information relating to these customers was included documents downloaded and exported by Mr. Maharaj to his personal USB device which remain in his possession as a Kandji employee.   Defendants are jointly using Jamf's confidential and trade secret information for their benefit.

131.   In doing the acts complained of herein, Defendants have used or will use Jamf's trade secrets without a privilege to do so.   Defendants' conduct therefore qualifies as misappropriation under 18 U.S.C. § 1839(5), giving rise to the remedies described in 18 U.S.C. § 1836(b)(3).

132.     As a result of the above conduct, Jamf is entitled to preliminary, including entry of a temporary restraining order, and permanent equitable relief to bar Defendants' continued possession and use of Jamf's trade secrets and to recover any compensatory damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### Tortious Interference with Contractual Relations
### (Against Kandji)

133.     Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 132 as if fully set forth herein.

134.     Mr. Maharaj owes contractual obligations to Jamf pursuant to the Service Agreement and NDA, which are valid and enforceable, namely his confidentiality obligations.

135.     Kandji was aware of the agreements.

136.     Kandji intentionally and unjustifiably interfered with Mr. Maharaj's agreements by inducing him to breach his agreements with Jamf.

137.     Kandji's unjustifiable interference includes, but is not limited to, continuing to employ Mr. Maharaj without requiring him to disgorge himself of the Jamf trade secrets he is utilizing to secure customers on Kandji's behalf, which violates his Agreements.

138.     As a direct and proximate result of Kandji's intentional and unjustified interference with the agreements, Jamf has suffered and will continue to suffer irreparable harm in addition to monetary damages in an amount to be determined at trial.

139.     Kandji's conduct was malicious and wanton, warranting an award for punitive damages.

### FIFTH CLAIM FOR RELIEF
### Tortious Interference with Business Relations/Prospective Economic Advantage
### (Against Defendants)

140.    Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 138 as if fully set forth herein.

141.    Defendants knew or should have known that Jamf had existing advantageous business relations with a number of clients and prospective clients.

142.    Defendants interfered with Jamf's advantageous business relations and prospective economic advantages with its clients and prospects, including, but likely not limited to, Renewal Customer A, Renewal Customer B, Prospective Customer A, and Prospective Customer B.

143.    Upon information and belief, Defendants have interfered with Jamf's advantageous business relations and prospective economic advantages with additional clients and prospects.

144.    Such interference was intentional, malicious, and without legal justification, and was conducted by improper means and for an improper purpose, namely to unfairly compete with Jamf and give Kandji and undeserved jumpstart on its operations in India.

145.    As a result of Defendants' conduct, Jamf has suffered and will continue to suffer substantial and irreparable harm.

## **JURY DEMAND**

146.    Plaintiff Jamf Software, LLC, hereby demands a jury trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jamf Software, LLC, respectfully prays for judgment in its favor and against Defendants, as follows:

1.    Grant preliminary and permanent injunctive relief, including entry of a temporary restraining order that:

A. Requires the return and disgorgement of all Jamf documents and information from Defendants' possession and that restrains and enjoins Defendants from continuing to use any documents or information misappropriated from Jamf;

B. Requires Mr. Maharaj to comply with his post-relationship contractual obligations to Jamf, including an injunction prohibiting Mr. Maharaj from soliciting Jamf clients while possessing its confidential information in violation of his Jamf agreements and prohibiting Kandji from interfering with Mr. Maharaj's obligations to Jamf under those Agreements;

C. Compels Defendants to produce all work computers, cellular phones, USB drives, thumb drives, disks, external hard drives, or any other electronic storage devices or systems which Defendants have utilized at any time from June 2023 to the present (the "Electronic Media");

D. Compels Defendants to produce their Electronic Media to a computer forensics expert identified by Jamf to conduct an appropriate search and forensic review of those devices;

E. Ordering that discovery immediately commence and be conducted on an expedited basis;

F. Requires Defendants to account for and return all Jamf trade secrets and confidential information in their possession, custody, or control, and to certify that they have returned to Jamf all of Jamf's trade secrets and confidential information in their possession, custody, or control;

G. Requires Defendants to provide an accounting of all revenues and profits derived from, facilitated by, or obtained by each of them, directly or indirectly, as a result

of Defendants' misappropriation of Jamf's trade secrets and confidential information;

2.   Grant Jamf a trial by jury on all issues so triable;

3.   Grant Jamf judgment against Defendants for actual damages in an amount to be shown at trial of this action;

4.   Assess exemplary damages, costs, and attorneys' fees against Defendants.

5.   Award Jamf punitive damages.

6.   Award Jamf pre-judgment and post-judgment interest on all damages proven at trial of this action.

7.   An award of compensatory and consequential damages under the Defend Trade Secrets Act, including damages pursuant to 18 U.S.C. § 1836(b)(3)(B), in an amount to be determined at trial, plus all interest and costs permitted by law, for Defendants' misappropriation of Jamf's trade secrets.

8.   An award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in an amount up to two times the damages awarded under 18 U.S.C. § 1836(b)(3)(B).

9.   An award against Mr. Maharaj of contract damages for material breaches of the Service Agreement and NDA, in an amount to be determined at trial.

10.   An award of Jamf's attorneys' fees incurred in its prosecution of this action pursuant to 18 U.S.C. § 1836(b)(3).

11.   Grant Jamf such other and further relief as this Court may deem just and proper.

This 17th day of August, 2023.

/s/ Andrew D. Moran

Andrew D. Moran (0392381)
Larkin Hoffman Daly & Lindgren Ltd.
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota  55437-1060
(952) 835-3800
amoran@larkinhoffman.com
Attorneys for Jamf Software, LLC

Brodie D. Erwin
*Pro Hac Vice* Application to be Filed
KILPATRICK TOWNSEND & STOCKTON LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
Telephone:  (919) 420-1818
Fax:     (919) 710-8226

Andrew T. Williamson
*Pro Hac Vice* Application to be Filed
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street N.E., Suite 2800
Atlanta, GA  30309
Telephone:  (404) 815-6522
Fax:     (404) 815-6555

## **VERIFICATION**

STATE OF MINNESOTA    §
                                      §
COUNTY OF HENNEPIN   §

     NOW COMES ELIZABETH BENZ who deposes and says:

     1.     I am over the age of eighteen (18) years, am of sound mind and am otherwise qualified and capable to make this Verification.

     2.     I am the Chief Sales Officer for Jamf Software, LLC ("Jamf"). I am authorized to make this verification on behalf of Jamf.

     3.     I have read the foregoing Verified Complaint and the allegations contained therein. The factual allegations contained in the Verified Complaint are true and correct based on my personal knowledge, the records of Jamf and/or information available through employees and agents of Jamf.

     4.     Attached to this Verified Complaint are Exhibits A – C. I have reviewed Exhibits A – C and can confirm they are authentic records maintained by Jamf in the regular course of its business.

     5.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

     Executed this 17th day of August, 2023.

                                                                    Elizabeth Benz