# Exhibit A

## SERVICE AGREEMENT

This Service Agreement (the "**Agreement**") is made by and between:

**JAMF Software, LLC** located at 100 Washington Avenue South, Suite 1100, Minneapolis, MN USA 55401, (hereinafter referred to as the "**Company**")

AND

**Prakash Maharaj** an Indian citizen, bearing permanent account number ALJPM8418Q , having place of business at Mumbai (India) (hereinafter referred to as the "**Service Provider**")

The Company and the Service Provider shall be individually referred to as a "**Party**" and collectively as "**Parties**" under this Agreement

**RECITALS**

a. Company is engaged in the business of developing, marketing and selling software that manages the provision, management and deployment of MacOS, iOS and tvOS devices.

b. The Service Provider has knowledge and expertise in performing business development and sales services (hereinafter referred to as the "**Services**") that is useful to the Company.

c. The Company desires to engage the Service Provider to assist in providing the Services in the areas of its expertise to the Company and the Service Provider is willing to provide those Services on the terms and conditions provided under this Agreement.

d. In order to facilitate the aforementioned engagement and completion of the provision of Services by the Service Provider, the Parties hereby agree to execute this Agreement upon the terms and conditions set forth hereunder.

## 1. DEFINITIONS

1.1. In this Agreement (including the Recitals), the following words and expressions shall have the following meanings:

"**Applicable Laws**" shall mean and include all statutes, enactments, acts of legislature or parliament, ordinances, rules, bye-laws, regulations, notifications, guidelines, policies, directions, directives and orders, requirement or other governmental restrictions or any similar form of decision of, or determination by, or any interpretation, policy or administration, having the force of law of any of the foregoing, of any government, statutory authority, tribunal, board, court, having jurisdiction over the matter in question, whether in effect as of the date of execution of this Agreement or thereafter.

"**Confidential Information**" shall have the meaning as ascribed to it under Clause 9.1.

"**Consultancy Fees**" shall have the meaning as ascribed to it under Clause 6.1.

"**Governmental Authority**" shall mean any federal, state, local government or governmental, administrative, fiscal, judicial, or government-owned body, department, commission, authority, tribunal, agency or entity, or central bank (or any person, whether or not government owned and howsoever constituted or called, that exercises the functions of a central bank);

"**Indemnified Party**" shall have the meaning as ascribed to it under Clause 10.1.

"**Reimbursements**" shall have the meaning as ascribed to it under Clause 6.3.

"**Service Provider Materials**" shall have the meaning as ascribed to it under Clause 8.3.

"**Term**" shall have the meaning as ascribed to it under Clause 3.1.

"**Work Product**" shall have the meaning as ascribed to it under Clause 9.2

1.2. **INTERPRETATIONS** : In this Agreement, unless the context otherwise requires:

1.2.1. Words denoting the singular shall include the plural and words denoting any gender shall include all genders.

1.2.2. Headings, subheadings, titles, subtitles to clauses, sub-clauses and paragraphs are for information only and shall not form part of the operative provisions of this Agreement or the annexures hereto and shall be ignored in construing the same.

1.2.3. References to days, months and years are to calendar days, calendar months and calendar years, respectively.

1.2.4. Unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the next Business Day if the last day of such period is not a Business Day; and whenever any payment is to be made or action to be taken under this Agreement is required to be made or taken on a day other than a Business Day, such payment shall be made or action taken on the next Business Day

1.2.5. References to any legislation or law or to any provision thereof shall include references to any such law or provisions as it may, after the date of execution, from time to time, be amended, supplemented or re-enacted and any reference to a statutory provision shall include any subordinate legislation made from time to time under that provision.

1.2.6. References to the words "include" or "including" shall be construed without limitation. The words "directly or indirectly" mean directly or indirectly through one or more intermediary persons, or through contractual or other legal arrangements, and "direct or indirect" shall have the correlative meanings

1.2.7. Any reference in this Agreement, to consent or approval or similar connotation, unless expressly stated otherwise, shall be in writing, and shall include electronic email communications followed by facsimile communications.

1.2.8. No provisions of this Agreement shall be interpreted in favor of, or against, any Party by reason of the extent to which such Party or its counsel participated in the drafting hereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof.

1.2.9. The Schedules shall constitute an integral part of this Agreement and any reference.

2. **SCOPE OF THE AGREEMENT**

2.1. The Company hereby agrees to engage the Service Provider and the Service Provider hereby agrees to act as an independent consultant to the Company on the terms and conditions set forth herein. The Services to be provided by the Service Provider is set out in detail in **Schedule 1** of this Agreement.

2.2. The Service Provider hereby agrees that it shall not, in any event, act on behalf of the Company or any other entity associated or owned by the Company.

2.3. The Service Provider shall not represent itself to be an employee of the Company and has no right to enter into any agreements or otherwise enter into any binding legal obligation on behalf of the Company.

2.4. The Service Provider acknowledges that he is an independent contractor and not an employee of the Company and that he is not the legal representative or agent of, nor have the power to obligate, the Company for any purpose whatsoever. He further acknowledges that his services do not include any supervisory responsibilities with respect to employees or other contractors of the Company.

2.5. The Service Provider expressly acknowledges that the relationship intended to be created by this Agreement is a business relationship based entirely on and circumscribed by the express provisions of this Agreement and that no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.

2.6. The Company shall carry no workers compensation insurance or any health or accident insurance to cover the Service Provider. The Company shall not pay contributions to social security, unemployment insurance, federal or state withholding taxes, nor provide any other contributions or benefits which might be expected in a customary employer-employee relationship, for the Service Provider.

## 3.   TERM OF THE AGREEMENT

3.1. This Agreement shall come into force on the effective date set forth above (the "**Effective Date**") and shall continue for a period of one ("1") year from the Effective Date ("**Term**"). Unless approved in writing by the Company, the Agreement shall stand terminated upon the expiry of the aforementioned Term and the Company shall have no obligation, whatsoever, towards the Service Provider upon such expiry.

## 4.   THE SERVICE PROVIDER'S DUTIES AND OBLIGATIONS

The Service Provider hereby undertakes to comply with the following duties and obligations in the performance of its Services pursuant to this Agreement:

4.1. The Service Provider shall perform his duties conscientiously and with due diligence, devoting all his abilities and experience, and bearing in mind the affairs and interest, goodwill, good reputation and credibility of the Company;

4.2. The Service Provider shall at all times act in the best interests of the Company and apply, when carrying out his duties, the highest standards of conduct appropriate for the Services and in accordance with industry practices prevailing at any given point of time;

4.3. The Service Provider shall ensure that it shall not engage with or employ any third party, independent consultant or subcontractor for the purposes of performance of Service hereunder, without the prior written consent of the Company; in any event, the Service Provider shall, at all times, be liable and responsible for any and all acts and omissions of such third parties engaged by the Service Provider, notwithstanding any consent provided by the Company;

4.4.   The Service Provider shall follow the instructions given by the Company or by persons authorized by the Company in the requirements related to performance of Services. However, any such instructions or guidelines provided by the Company shall not be construed as exercising control over the performance of Services and the Service Provider hereby acknowledges that it shall perform the Services independently, without any need for direct supervision by the Company;

4.5.   The Service Provider shall fully co-operate with the Company and any other persons identified or employed by the Company during the performance of Services and shall seek appropriate guidance, where required, for the efficient and appropriate discharge of his Services so it is useful to the Company for the purposes for which such Service Provider is engaged;

4.6.   The Service Provider shall obtain and maintain, as required, all necessary permits, licenses or approvals from Government Authority in relation to the performance of the Services;

4.7.   The Service Provider shall perform all his obligations in good faith and under no circumstance willfully suppress any information or misrepresent or act in such manner that would prejudice the interests of the Company, in the course of fulfilling the obligations under this Agreement;

4.8.   The Service Provider shall not engage in any acts or deeds such that would be detrimental to the interests of the Company, tarnish its reputation or cause the Company to be involved in any legal or ethical controversy.

4.9.   The Service Provider further agrees not to offer or receive any benefits, gifts other forms of gratitude from any third party (including but not limited to prospective customers, companies or others) for the purposes of successful completion of the Services nor conduct himself in any manner which will or is likely to result in any conflict of interest in the performance of Services or obligations hereunder; and

4.10.  The Service Provider must provide to the Company, a monthly report of the progress of the performance of the Services pursuant to the requirements of the Company as it will convey from time to time under the framework of this binding Agreement. The Service Provider shall provide, within 10 days from such date of termination or expiry of this Agreement, a final report to the Company covering the progress of the Services performed during the entire term of this Agreement.

4.11.  The Service Provider may temporarily entrust the performance of the Services to a third party or engage such third parties to assist him only after and upon receipt of a prior written approval from the Company. The Service Provider shall submit to the Company, the details of such third party, including his / her qualifications prior to seeking any approval from the Company. The Service Provider shall ensure to comply with the provisions of this Agreement while engaging with such third party and shall at all times be responsible for such third party's compliance of the terms hereunder. The Service Provider is liable as for his own acts and omissions and also for the acts and omissions of the third parties who are engaged for the performance of the Services hereunder pursuant to this Clause.

## 5.   COMPANY'S OBLIGATIONS

5.1.   The Company hereby undertakes to provide the Service Provider with access to information technology or business infrastructure as required for the performance of Services hereunder and shall provide reasonable cooperation, information, documents and materials that are necessary to perform the Services.

## 6.   CONSULTANCY FEES AND RELATED EXPENSES

6.1.   <u>Consultancy Fees</u>. As consideration for performing the Services hereunder, the Company shall pay the Service Provider a monthly consultancy fee of USD $5,500 (US Dollars Five Thousand Five Hundred) (the "**Consultancy Fee**").  Consultant shall also have the opportunity to earn additional variable

compensation on a calendar quarterly basis provided he meets the quarterly objectives set forth on Schedule 1 as the same may be amended from quarter to quarter (the "**Variable Fee**"). The parties agree that the performance objectives within Schedule 1 may be amended on a quarterly basis and may be documented via an email from Company to Service Provider documenting such objectives and a formal amendment to this Agreement will not be needed for each such quarterly target.

6.2.  <u>Payment Terms</u>. The Consultancy Fee shall be payable monthly in advance by the Company. The Variable Fees (if earned) shall be payable by the Company on a quarterly basis within forty-five (45) days from the date of the end of each calendar quarter.

6.3.  <u>Expenses</u>. The Service Provider shall submit receipts for any reasonable and documented travel, accommodation and meal expenses incurred in connection with the performance of the Services. Reimbursement of such expenses shall at all times be subject to the Company's relevant policies and procedures. Approved expenses will be reimbursed on a monthly basis.

6.4.  <u>Taxes</u>. The Consultancy Fees shall be inclusive of any and all federal and state sales, use and value added taxes applicable to the performance of Services and the Service Provider shall be responsible for the remittance of such taxes to the appropriate Government Authority].

6.5.  <u>Payment method</u>. The Consultancy Fees and Reimbursements will be payable by bank transfer to the Service Provider's authorized back account provided to Company. It shall be the Service Provider's responsibility to submit all requisite documentation and information to the Company in accordance with Company's policies and procedures for the purposes of receiving timely payments. The Company shall in no event be responsible for any payments if the Service Provider fails to furnish any material documentation or information that are required for making such payment.

6.6.  <u>Other terms.</u> The Service Provider is not entitled to receive the Consultancy Fees for the period in which no Services are rendered. If the Agreement is terminated prior to the Term, the Service Provider will be entitled to receive the Fee in proportion to the period in which it performed Services for the Company. Payment for Consultancy Fees shall not be automatically deemed to constitute any acceptance of the Services provided thereunder.

## 7.  REPRESENTATIONS AND WARRANTIES

The Service Provider hereby represents and warrants the following:

7.1.  That the execution and performance under this Agreement constitutes a legal, valid and binding obligation, enforceable against the Service Provider in accordance with the terms set forth hereunder;

7.2.  That the execution or performance of this Agreement by the Service Provider shall not and will not breach or conflict with any other obligation, contract, agreement or arrangement of the Service Provider with any third party;

7.3.  That the Service Provider has never been charged with or convicted of a misdemeanor involving negligence, fraud, dishonesty, controlled substances or moral turpitude or any crime concerning the provision of Services;

7.4.  That the Service Provider shall, at all times, perform the Services and its obligations hereunder in accordance with Applicable Laws, rules, regulations, plans and policies in force from time to time and such standards and specifications as may be prescribed by the Company, from time to time and at all times be in strict conformity with the terms and conditions of this Agreement;

7.5.   That all Services performed hereunder will be performed with due care, skill, and diligence, in accordance with the highest applicable professional standards recognized by the Service Provider's profession;

7.6.   That the Service Provider shall be responsible for the professional quality, technical accuracy, completeness and coordination of all reports, designs, deliverables, drawings, plans, information, specifications, and other Services provided under this Agreement;

7.7.   That the Services shall be performed to Company's satisfaction in accordance with the terms herein agreed to;

7.8.   That the Service Provider has the right to disclose all information transmitted to the Company under this Agreement and that it has all rights and title necessary to provide the Services; and

7.9.   That the Service Provider has not and will not enter into any agreements or arrangements which will preclude compliance with the provisions of this Agreement.

## 8.   INTELLECTUAL PROPERTY RIGHTS

8.1.   <u>Work Products</u>.

8.1.1.   All items, programs, ideas and the like and all Work Product (*as defined below*), if any, including table structures, forms, reports and programming tools created by or with the assistance of the Service Provider pursuant to this Agreement, whether prepared on or off Company's premises, shall be and remain the sole property of the Company and shall be deemed to be works "made-for-hire" under the Applicable Law.

8.1.2.   To the extent that any such items and all Work Product may not, by operation of law, be works made for hire, the Service Provider hereby assigns to the Company the ownership of all rights, titles and interests in such Work Product, including, but not limited to copyrights, and the Company shall have the right to obtain and hold in its own name, copyright or other protection which may be available or become available in such items. The Service Provider agrees to provide the Company, its designees, or assignees all assistance reasonably required to perfect such rights, titles and interests in and to the Work Product.

8.1.3.   The Service Provider hereby further agrees to disclose promptly to the Company all inventions, discoveries, formulas, processes, designs, trade secrets and other useful information and know-how made, discovered or developed by the Service Provider alone or in conjunction with any other person or entity during the term of this Agreement that are based on, derived from or make use of any Confidential Information (*as defined below*) or any other information disclosed to or acquired by the Service Provider during the term of this Agreement and all such information shall be deemed Confidential Information.

8.2.   <u>Tools</u>.

8.2.1.   The Service Provider undertakes to use his own tools necessary to perform the Services, however for the duration of this Agreement and for the purpose of performing the Services the Company may provide the Service Provider with the necessary equipment (the "**Entrusted Tools**") as reasonably determined by the Company.

8.2.2.   The Service Provider shall: (i) not cause any damage or destruction to the materials, documents, the Entrusted Tools and other items received in connection with performing the Services hereunder (the "**Items**"), and (ii) notify the Company immediately of any such loss or damage to the Items.

8.2.3.   The Service Provider shall be liable for any loss or damage to the Items, excluding any normal wear and tear that occur in the ordinary course of business.

8.2.4.   Upon Company's request and in the event of any expiry or termination of this Agreement, the Service Provider shall return:

(i)     all documents, in particular all materials and documents concerning trade secrets and other business information (including but not limited to databases, lists, information and documents pertaining to the Company's customers and / or Company's employees) that was prepared, gathered or obtained during the term of this Agreement or in connection with or during the performance of the Services, including any copies thereof, as well as records on other electronic data carriers;

(ii)    unused materials, and

(iii)   Entrusted Tools and other Items received from the Company in connection with the performance of the Services hereunder and shall provide a written statement in which he accounts for the materials used hereunder.

## 9.   CONFIDENTIALITY

9.1.  In connection with the performance of Services hereunder, the Company may disclose to the Service Provider, or the Service Provider may have access to Company's Confidential Information. As used herein, the term "**Confidential Information**" shall mean any and all proprietary or confidential information, whether or not developed by the Service Provider, including, without limitation: (i) any and all software programs, derivative works, products and other results of the Services performed by Subcontractor under this Agreement (together the "**Work Product**"); (ii) any and all technical information of the Company or its customers, including, without limitation, product data and specifications, requirements, methodologies, tools, know-how, formulae, the source code, and other software information, processes, inventions, research projects, and product development; (iii) any and all business information of or relating to the Company or its customers that is not known to the general public, including, without limitation, accounting and financial information, sales and marketing information, research, investment analyses, investment strategies and techniques, investment transactions and holdings, clients, personnel, shareholders, and information concerning "know-how" and information, data and material used or licensed by the Company or its customers, including, but not limited to computer software, programming, research, financial information and analyses, and the like documentation relating thereto; (iv) any and all employee information of the Company; (v) confidential information disclosed to the Company by any third party, including its customers to which the Service Provider has access to; and (vi) any personally identifiable information relating to the Company and its customers as made available during the performance of Services hereunder. Service Provider acknowledges and agrees that the Confidential Information constitutes valuable trade secrets of the Company or its customers, as the case may be.

9.2.  The Service Provider shall not disclose any Confidential Information to any third party, nor shall use any Confidential Information for any purpose other than for the performance of Services for the Company. All materials furnished to the Service Provider by the Company shall be considered Confidential Information, shall remain the property of the Company and shall be returned to the Company promptly upon the expiry or termination of this Agreement or at Company's earliest request. Service Provider shall not copy, reproduce or appropriate for its benefit or the benefit of any third party, any of the Confidential Information. Service Provider further agrees that he/she shall execute and deliver such additional confidentiality agreements as may be reasonably required by Company's suppliers or customers with respect to Service Provider's assignments that may expose Service Provider to the confidential information of Company's suppliers or customers

9.3. Service Provider's obligations under this Clause 9 will continue for each item of Confidential Information until such time as Service Provider can show that such item of Confidential Information (i) is or becomes publicly available other than as a result of any act or failure to act by the Service Provider; (ii) was known to the Service Provider, without an obligation to keep it confidential, prior to Service Provider's receipt of such item of Confidential Information from the Company or its customer; or (iii) has legally and properly been received by the Service Provider from a person other than the Company, through no breach of any agreement with the Service Provider or Company and without an obligation to keep it confidential.

9.4. <u>Personal Data</u>. The Service Provider shall process any personal information or sensitive personal data obtained in connection with the execution and performance hereof in compliance with Applicable Laws and regulations. The Service Provider undertakes not to disclose such personal data obtained from the Company to any third parties, including making the data available or entrusting them to third parties for processing, and to process the personal data obtained from the Company only within the scope and for the purpose required for the performance hereof.

9.5. The obligations of confidentiality set forth under this Clause 9 shall survive any expiry or termination of this Agreement for an indefinite period.

## 10. INDEMNITY

10.1. The Service Provider, at his expense, shall defend, indemnify and hold harmless the Company, its affiliates, directors, agents, employees and representatives (each an "**Indemnified Party**") from and against all actual claims, liabilities, expenses, costs, losses or damage of whatsoever nature (including reasonable attorneys' fees) which the Indemnified Party may suffer or incur, arising out of, in relation to or in connection with the following:

10.1.1. Any breach by the Service Provider of the terms and conditions under this Agreement;

10.1.2. Any violation of Applicable laws, fraud, negligence or misconduct by the Service Provider including without limitation in relation to the performance of Services hereunder;

10.1.3. Any infringement of Intellectual Property or proprietary right of any third party in relation to the Services rendered pursuant to this Agreement;

10.2. The indemnification rights of the Company under this Agreement are independent of, and in addition to, such other rights and remedies it may have under Applicable Laws or in equity or otherwise, including the right to seek specific performance, or other injunctive relief.

## 11. LIABILITY

11.1. In no event shall the Company be liable to the Service Provider or any other person for any indirect, special, incidental, exemplary, punitive or consequential damages arising out of, in relation to or in connection with this Agreement of any kind or nature whatsoever, whether in an action based on contract, warranty, strict liability, tort (including, without limitation, negligence) or otherwise, even if the Company has been informed in advance of the possibility of such damages or such damages could have been reasonably foreseen by the Company.

## 12. TERMINATION OF THE AGREEMENT

12.1. This Agreement may be terminated forthwith by the Company at any given point of time, by issuing a written notice:

12.1.1. If the Service Provider is in breach of the terms and conditions of this Agreement and the same is not remedied to the satisfaction of the Company within a period of 7 (seven) days from notice of such breach;

12.1.2. In case of any willful misconduct or gross negligence by the Service Provider in connection with the performance of Services and obligations under this Agreement during the Term; and

12.1.3. Any representation or warranty provided by the Service Provider is found to be incorrect; and

12.1.4. If the Service Provider is or may be in violation of any Applicable Law.

12.2.  All obligations of the Parties under this Agreement shall cease from the date of any termination of this Agreement and the Service Provider shall be entitled to receive such Consultancy Fees, as due and payable, up to and through the effective date of such termination.

12.3.  Upon any termination, the Service Provider shall immediately return to the Company (without retaining any copies or extracts thereof) any Confidential Information, Work Product and Intellectual Property and provide a written certification to that effect.

## 13. RESTRICTIVE COVENANTS

13.1.  Service Provider agrees that during the Term of this Agreement and for a period of twelve (12) months thereafter, regardless of the reason for separation, Service Provider will not, directly or indirectly, on his or her own behalf, or on behalf of a third party:

13.1.1. Be employed by, perform any services for, do work under contract for, acquire an interest in, or become affiliated or connected with, any of the following Companies:[1];

13.1.2. Hire, offer to hire, entice away or in any other manner persuade or attempt to persuade any officer, employee or agent of Company or its affiliates to discontinue his/her relationship with Company;

13.1.3. Solicit any customers of the Company nor aid or assist any other person, firm, corporation or association in the solicitation of such clients when such solicitation is to obtain business or knowledge which pertains to the business of Company; and

13.1.4. Within India, where the Service Provider conducted any business during the Term of this Agreement or performed acts to own, manage, operate or control, or participate in the ownership, management, operation or control of, or be employed by or act as a consultant, advisor or independent contractor to, or be connected in any manner with any of the companies mentioned in Clause 13.1.1 above

## 14. GOVERNING LAW & JURISDICTION

14.1.  This Agreement shall be governed in accordance with the laws of the state of Minnesota, USA without reference to the principles of conflicts of law.

14.2.  Any dispute which may arise between the Parties concerning this Agreement shall be determined as provided in this Clause 14. For the purpose of this Clause, a dispute shall be deemed to have arisen when one Party serves on the other a notice in writing stating the nature of the dispute.

14.3.  Unless this agreement has already been terminated by the date of the notice of dispute, the Service Provider shall, in every case, continue with the Services with all due diligence regardless of the nature of the dispute and the Company shall continue to make payments (excluding any disputed sums) in accordance with the Agreement.

14.4.  After service of the notice of dispute, the following procedure shall be followed by the Parties (all periods specified in this Clause 14.2 shall be extendable by mutual agreement):

(a) within 7 days, the Service Provider and the Company Representative shall meet to attempt to settle the dispute;

---

[1] AirWatch (by VMWare), MobileIron, HEAT LanRev, FileWave, LANdesk, MaaS360 (by IBM), Parallels, ZuluDesk,

(b) if the Service Provider and the Company Representative are unable to reach a settlement within seven days from the date of service of the notice, executives of each of the parties shall meet within the following seven days to attempt to settle the dispute; and

(c) if no settlement results from the meeting specified in Clause 43.4(b), for the following 20 days the Parties shall attempt to settle the dispute by mediation by an independent mediator, with costs to be shared equally between the parties.

14.5.  If no settlement is reached under clause 14.2, each Party hereby submits itself for the sole purpose of this Agreement and any controversy arising hereunder to the exclusive jurisdiction of the federal or state courts located in the State of Minnesota and any courts of appeal therefrom and waives any objection (on the grounds of lack of jurisdiction, forum non-conveniens or otherwise) to the exercise of such jurisdiction over it by any such courts.

## 15.  NOTICES

15.1.  Any notice or other written communication given under or in connection with this Agreement may be delivered personally or sent by registered post or electronic mail or facsimile. The address for service of any Party shall be as set out below.

If to the Company:
100 Washington Avenue South, Suite 1100, Minneapolis, MN 55441 USA
Attn:  Legal Department

If to the Service Provider:
Address:
Contact Number:

15.2.  Any such notice or other written communication shall be deemed to have been served -

15.2.1.  If delivered personally to the relevant individual or to the address for the service, at the time of delivery;

15.2.2.  If posted, at the expiry of two business days or in the case of airmail four business days after it was posted;

15.2.3.  If by electronic email sent by email with confirmed receipt return email within 1 (one) business day, otherwise followed by either delivery options set out in this Clause 16.2.

## 16.  MISCELLANEOUS PROVISIONS

16.1.  Amendments: No amendment/modification of this Agreement shall be valid unless it is made by an instrument in writing and signed by duly authorized representatives of each of the Parties hereto or thereto. All legally required amendments shall automatically become an integral part of this Agreement. However, on such event so happening a written confirmation to that effect, duly executed by both the Parties shall be made out and attached to this Agreement and which shall form an integral part hereof.

16.2.  Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

16.3.  Entire Agreement: This Agreement sets out the entire Agreement and understanding between the Parties with respect to the subject matter hereof. This Agreement supersedes all previous letters of intent, confidentiality agreements, heads of terms, prior discussions and correspondence exchanged between any of the Parties in connection with the subject matter hereof, all of which shall not have any further force or effect. This Agreement, together with the Schedules hereunder and such other attachments as by mutual agreement be made out and duly executed by both the Parties, is the entire

Agreement and expresses the complete, exclusive and final understanding of the Parties with regard to the subject matter herein and may not be altered, amended or modified except in writing and signed by the Parties.

16.4.   Survival: The terms and provisions of this Agreement that by their nature and content are intended to survive the performance hereof by any of all Parties hereto shall so survive the completion and termination of this Agreement.

16.5.   No conflict. Service Provider represents that his performance of all the terms of this Agreement and duties hereunder will not breach any agreements relating to invention assignment, confidential information, non-competition with any other party. Service Provider further represents that he will not bring to the Company or use in the performance of the Services any documents or materials of any other party that are not generally available to the public or which he does not have written permission to use in the course of performing his duties as a service provider hereunder.

16.6.   Injunctive relief. Service Provider hereby agrees that in the event of a breach or threatened breach of this Agreement, the Company will suffer irreparable harm and will be entitled to injunctive relief to enforce this Agreement.

16.7.   Use of marks. In connection with this Agreement, Service Provider will not use the Company's name in any form of publicity, or to release to the public any information relating to the work to be performed hereunder, or to otherwise disclose or advertise this Agreement, except under the following circumstances: (a) to provide specific information to existing or potential customers of the Company with regard to a possible engagement; (b) with the specific prior approval in writing from the Company; and (c) if required pursuant to any Applicable Law.

16.8.   Assignment. The Service Provider shall not assign or transfer any of his obligations and duties hereunder to any third party without the prior written consent of the Company.

16.9.   Severability: If any provision of this Agreement is or becomes invalid, illegal or unenforceable under Applicable Laws, then such provision shall (so far as it is invalid or unenforceable) be given no effect and shall be deemed not to be included in this Agreement but without invalidating any of the remaining provisions of this Agreement, which shall not in any way be affected or impaired. The Parties hereto shall then negotiate and replace the invalid or unenforceable provision with a valid and enforceable and mutually satisfactory substitute provision, achieving as nearly as possible the intended commercial effect of the invalid, illegal or unenforceable provision.

16.10.   Further Assurances: The Service Provider shall execute, acknowledge, prepare and deliver to the Company without additional compensation, any and all instruments or applications for securing, protecting or registering any property rights embraced within this Agreement.

**JAMF Software, LLC (Company):**

_____

Signature

CFO
_____

Title

November 20, 2018
_____

Date

**Service Provider:**

_____

Signature

_____

Title

19.10.2018
_____

Date

**SCHEDULE 1**
**SERVICES**

| Scope of the Services |
|---|
| The Service Provider shall provide the following Services: |
| 1. Work with Company's teams and personnel to develop Indian markets.<br><br>2. Targets, until the end of December 31, 2018 are as below:<br>a) Close and win at least USD$180.000 of ACV opportunities.<br><br>b) Onboard at least 2 new partners with a proper business plan for FY19.<br><br>3. Goals and Targets for FY19 will be on a quarterly basis.<br><br><br>Variable Fee:  Upon achievement of the above targets Service Provider is eligible to earn up to $4,125 in each quarter |

## SERVICE AGREEMENT

This Service Agreement (the "**Agreement**") is made by and between:

**JAMF Software, LLC** located at 100 Washington Avenue South, Suite 1100, Minneapolis, MN USA 55401, (hereinafter referred to as the "**Company**")

AND

**Prakash Maharaj** an Indian citizen, bearing permanent account number ALJPM8418Q , having place of business at Mumbai (India) (hereinafter referred to as the "**Service Provider**")

The Company and the Service Provider shall be individually referred to as a "**Party**" and collectively as "**Parties**" under this Agreement

**RECITALS**

a. Company is engaged in the business of developing, marketing and selling software that manages the provision, management and deployment of MacOS, iOS and tvOS devices.

b. The Service Provider has knowledge and expertise in performing business development and sales services (hereinafter referred to as the "**Services**") that is useful to the Company.

c. The Company desires to engage the Service Provider to assist in providing the Services in the areas of its expertise to the Company and the Service Provider is willing to provide those Services on the terms and conditions provided under this Agreement.

d. In order to facilitate the aforementioned engagement and completion of the provision of Services by the Service Provider, the Parties hereby agree to execute this Agreement upon the terms and conditions set forth hereunder.

**1.   DEFINITIONS**

1.1. In this Agreement (including the Recitals), the following words and expressions shall have the following meanings:

"**Applicable Laws**" shall mean and include all statutes, enactments, acts of legislature or parliament, ordinances, rules, bye-laws, regulations, notifications, guidelines, policies, directions, directives and orders, requirement or other governmental restrictions or any similar form of decision of, or determination by, or any interpretation, policy or administration, having the force of law of any of the foregoing, of any government, statutory authority, tribunal, board, court, having jurisdiction over the matter in question, whether in effect as of the date of execution of this Agreement or thereafter.

"**Confidential Information**" shall have the meaning as ascribed to it under Clause 9.1.

"**Consultancy Fees**" shall have the meaning as ascribed to it under Clause 6.1.

"**Governmental Authority**" shall mean any federal, state, local government or governmental, administrative, fiscal, judicial, or government-owned body, department, commission, authority, tribunal, agency or entity, or central bank (or any person, whether or not government owned and howsoever constituted or called, that exercises the functions of a central bank);

"**Indemnified Party**" shall have the meaning as ascribed to it under Clause 10.1.

"**Reimbursements**" shall have the meaning as ascribed to it under Clause 6.3.

"**Service Provider Materials**" shall have the meaning as ascribed to it under Clause 8.3.

"**Term**" shall have the meaning as ascribed to it under Clause 3.1.

"**Work Product**" shall have the meaning as ascribed to it under Clause 9.2

1.2. **INTERPRETATIONS** : In this Agreement, unless the context otherwise requires:

1.2.1. Words denoting the singular shall include the plural and words denoting any gender shall include all genders.

1.2.2. Headings, subheadings, titles, subtitles to clauses, sub-clauses and paragraphs are for information only and shall not form part of the operative provisions of this Agreement or the annexures hereto and shall be ignored in construing the same.

1.2.3. References to days, months and years are to calendar days, calendar months and calendar years, respectively.

1.2.4. Unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the next Business Day if the last day of such period is not a Business Day; and whenever any payment is to be made or action to be taken under this Agreement is required to be made or taken on a day other than a Business Day, such payment shall be made or action taken on the next Business Day

1.2.5. References to any legislation or law or to any provision thereof shall include references to any such law or provisions as it may, after the date of execution, from time to time, be amended, supplemented or re-enacted and any reference to a statutory provision shall include any subordinate legislation made from time to time under that provision.

1.2.6. References to the words "include" or "including" shall be construed without limitation. The words "directly or indirectly" mean directly or indirectly through one or more intermediary persons, or through contractual or other legal arrangements, and "direct or indirect" shall have the correlative meanings

1.2.7. Any reference in this Agreement, to consent or approval or similar connotation, unless expressly stated otherwise, shall be in writing, and shall include electronic email communications followed by facsimile communications.

1.2.8. No provisions of this Agreement shall be interpreted in favor of, or against, any Party by reason of the extent to which such Party or its counsel participated in the drafting hereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof.

1.2.9. The Schedules shall constitute an integral part of this Agreement and any reference.

2. **SCOPE OF THE AGREEMENT**

2.1.   The Company hereby agrees to engage the Service Provider and the Service Provider hereby agrees to act as an independent consultant to the Company on the terms and conditions set forth herein. The Services to be provided by the Service Provider is set out in detail in **Schedule 1** of this Agreement.

2.2.   The Service Provider hereby agrees that it shall not, in any event, act on behalf of the Company or any other entity associated or owned by the Company.

2.3.   The Service Provider shall not represent itself to be an employee of the Company and has no right to enter into any agreements or otherwise enter into any binding legal obligation on behalf of the Company.

2.4.   The Service Provider acknowledges that he is an independent contractor and not an employee of the Company and that he is not the legal representative or agent of, nor have the power to obligate, the Company for any purpose whatsoever. He further acknowledges that his services do not include any supervisory responsibilities with respect to employees or other contractors of the Company.

2.5.   The Service Provider expressly acknowledges that the relationship intended to be created by this Agreement is a business relationship based entirely on and circumscribed by the express provisions of this Agreement and that no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.

2.6.   The Company shall carry no workers compensation insurance or any health or accident insurance to cover the Service Provider. The Company shall not pay contributions to social security, unemployment insurance, federal or state withholding taxes, nor provide any other contributions or benefits which might be expected in a customary employer-employee relationship, for the Service Provider.

**3.   TERM OF THE AGREEMENT**

3.1.   This Agreement shall come into force on the effective date set forth above (the "**Effective Date**") and shall continue for a period of one ("1") year from the Effective Date ("**Term**"). Unless approved in writing by the Company, the Agreement shall stand terminated upon the expiry of the aforementioned Term and the Company shall have no obligation, whatsoever, towards the Service Provider upon such expiry.

**4.   THE SERVICE PROVIDER'S DUTIES AND OBLIGATIONS**

The Service Provider hereby undertakes to comply with the following duties and obligations in the performance of its Services pursuant to this Agreement:

4.1.   The Service Provider shall perform his duties conscientiously and with due diligence, devoting all his abilities and experience, and bearing in mind the affairs and interest, goodwill, good reputation and credibility of the Company;

4.2.   The Service Provider shall at all times act in the best interests of the Company and apply, when carrying out his duties, the highest standards of conduct appropriate for the Services and in accordance with industry practices prevailing at any given point of time;

4.3.   The Service Provider shall ensure that it shall not engage with or employ any third party, independent consultant or subcontractor for the purposes of performance of Service hereunder, without the prior written consent of the Company; in any event, the Service Provider shall, at all times, be liable and responsible for any and all acts and omissions of such third parties engaged by the Service Provider, notwithstanding any consent provided by the Company;

4.4.    The Service Provider shall follow the instructions given by the Company or by persons authorized by the Company in the requirements related to performance of Services. However, any such instructions or guidelines provided by the Company shall not be construed as exercising control over the performance of Services and the Service Provider hereby acknowledges that it shall perform the Services independently, without any need for direct supervision by the Company;

4.5.    The Service Provider shall fully co-operate with the Company and any other persons identified or employed by the Company during the performance of Services and shall seek appropriate guidance, where required, for the efficient and appropriate discharge of his Services so it is useful to the Company for the purposes for which such Service Provider is engaged;

4.6.    The Service Provider shall obtain and maintain, as required, all necessary permits, licenses or approvals from Government Authority in relation to the performance of the Services;

4.7.    The Service Provider shall perform all his obligations in good faith and under no circumstance willfully suppress any information or misrepresent or act in such manner that would prejudice the interests of the Company, in the course of fulfilling the obligations under this Agreement;

4.8.    The Service Provider shall not engage in any acts or deeds such that would be detrimental to the interests of the Company, tarnish its reputation or cause the Company to be involved in any legal or ethical controversy.

4.9.    The Service Provider further agrees not to offer or receive any benefits, gifts other forms of gratitude from any third party (including but not limited to prospective customers, companies or others) for the purposes of successful completion of the Services nor conduct himself in any manner which will or is likely to result in any conflict of interest in the performance of Services or obligations hereunder; and

4.10.   The Service Provider must provide to the Company, a monthly report of the progress of the performance of the Services pursuant to the requirements of the Company as it will convey from time to time under the framework of this binding Agreement. The Service Provider shall provide, within 10 days from such date of termination or expiry of this Agreement, a final report to the Company covering the progress of the Services performed during the entire term of this Agreement.

4.11.   The Service Provider may temporarily entrust the performance of the Services to a third party or engage such third parties to assist him only after and upon receipt of a prior written approval from the Company. The Service Provider shall submit to the Company, the details of such third party, including his / her qualifications prior to seeking any approval from the Company. The Service Provider shall ensure to comply with the provisions of this Agreement while engaging with such third party and shall at all times be responsible for such third party's compliance of the terms hereunder. The Service Provider is liable as for his own acts and omissions and also for the acts and omissions of the third parties who are engaged for the performance of the Services hereunder pursuant to this Clause.

## 5.   COMPANY'S OBLIGATIONS

5.1.    The Company hereby undertakes to provide the Service Provider with access to information technology or business infrastructure as required for the performance of Services hereunder and shall provide reasonable cooperation, information, documents and materials that are necessary to perform the Services.

## 6.   CONSULTANCY FEES AND RELATED EXPENSES

6.1.    <u>Consultancy Fees</u>. As consideration for performing the Services hereunder, the Company shall pay the Service Provider a monthly consultancy fee of USD $6,814.5 (US Dollars Six Thousand Eight Hundred Fourteen and 50 cent) (the "**Consultancy Fee**").  Consultant shall also have the opportunity to earn

additional variable compensation on a calendar quarterly basis provided he meets the quarterly objectives set forth on Schedule 1 as the same may be amended from quarter to quarter (the "**Variable Fee**").  The parties agree that the performance objectives within Schedule 1 may be amended on a quarterly basis and may be documented via an email from Company to Service Provider documenting such objectives and a formal amendment to this Agreement will not be needed for each such quarterly target.

6.2.   <u>Payment Terms</u>. The Consultancy Fee shall be payable monthly in advance by the Company.  The Variable Fees (if earned) shall be payable by the Company on a quarterly basis within forty-five (45) days from the date of the end of each calendar quarter.

6.3.   <u>Expenses</u>. The Service Provider shall submit receipts for any reasonable and documented travel, accommodation and meal expenses incurred in connection with the performance of the Services. Reimbursement of such expenses shall at all times be subject to the Company's relevant policies and procedures.  Approved expenses will be reimbursed on a monthly basis.

6.4.   <u>Taxes</u>. The Consultancy Fees shall be inclusive of any and all federal and state sales, use and value added taxes applicable to the performance of Services and the Service Provider shall be responsible for the remittance of such taxes to the appropriate Government Authority].

6.5.   <u>Payment method</u>. The Consultancy Fees and Reimbursements will be payable by bank transfer to the Service Provider's authorized back account provided to Company. It shall be the Service Provider's responsibility to submit all requisite documentation and information to the Company in accordance with Company's policies and procedures for the purposes of receiving timely payments. The Company shall in no event be responsible for any payments if the Service Provider fails to furnish any material documentation or information that are required for making such payment.

6.6.   <u>Other terms.</u> The Service Provider is not entitled to receive the Consultancy Fees for the period in which no Services are rendered. If the Agreement is terminated prior to the Term, the Service Provider will be entitled to receive the Fee in proportion to the period in which it performed Services for the Company. Payment for Consultancy Fees shall not be automatically deemed to constitute any acceptance of the Services provided thereunder.

## 7.   REPRESENTATIONS AND WARRANTIES
The Service Provider hereby represents and warrants the following:

7.1.   That the execution and performance under this Agreement constitutes a legal, valid and binding obligation, enforceable against the Service Provider in accordance with the terms set forth hereunder;

7.2.   That the execution or performance of this Agreement by the Service Provider shall not and will not breach or conflict with any other obligation, contract, agreement or arrangement of the Service Provider with any third party;

7.3.   That the Service Provider has never been charged with or convicted of a misdemeanor involving negligence, fraud, dishonesty, controlled substances or moral turpitude or any crime concerning the provision of Services;

7.4.   That the Service Provider shall, at all times, perform the Services and its obligations hereunder in accordance with Applicable Laws, rules, regulations, plans and policies in force from time to time and such standards and specifications as may be prescribed by the Company, from time to time and at all times be in strict conformity with the terms and conditions of this Agreement;

7.5.   That all Services performed hereunder will be performed with due care, skill, and diligence, in accordance with the highest applicable professional standards recognized by the Service Provider's profession;

7.6.   That the Service Provider shall be responsible for the professional quality, technical accuracy, completeness and coordination of all reports, designs, deliverables, drawings, plans, information, specifications, and other Services provided under this Agreement;

7.7.   That the Services shall be performed to Company's satisfaction in accordance with the terms herein agreed to;

7.8.   That the Service Provider has the right to disclose all information transmitted to the Company under this Agreement and that it has all rights and title necessary to provide the Services; and

7.9.   That the Service Provider has not and will not enter into any agreements or arrangements which will preclude compliance with the provisions of this Agreement.

## 8.   INTELLECTUAL PROPERTY RIGHTS

8.1.   <u>Work Products</u>.

8.1.1.   All items, programs, ideas and the like and all Work Product (*as defined below*), if any, including table structures, forms, reports and programming tools created by or with the assistance of the Service Provider pursuant to this Agreement, whether prepared on or off Company's premises, shall be and remain the sole property of the Company and shall be deemed to be works "made-for-hire" under the Applicable Law.

8.1.2.   To the extent that any such items and all Work Product may not, by operation of law, be works made for hire, the Service Provider hereby assigns to the Company the ownership of all rights, titles and interests in such Work Product, including, but not limited to copyrights, and the Company shall have the right to obtain and hold in its own name, copyright or other protection which may be available or become available in such items. The Service Provider agrees to provide the Company, its designees, or assignees all assistance reasonably required to perfect such rights, titles and interests in and to the Work Product.

8.1.3.   The Service Provider hereby further agrees to disclose promptly to the Company all inventions, discoveries, formulas, processes, designs, trade secrets and other useful information and know-how made, discovered or developed by the Service Provider alone or in conjunction with any other person or entity during the term of this Agreement that are based on, derived from or make use of any Confidential Information (*as defined below*) or any other information disclosed to or acquired by the Service Provider during the term of this Agreement and all such information shall be deemed Confidential Information.

8.2.   <u>Tools</u>.

8.2.1.   The Service Provider undertakes to use his own tools necessary to perform the Services, however for the duration of this Agreement and for the purpose of performing the Services the Company may provide the Service Provider with the necessary equipment (the "**Entrusted Tools**") as reasonably determined by the Company.

8.2.2.   The Service Provider shall: (i) not cause any damage or destruction to the materials, documents, the Entrusted Tools and other items received in connection with performing the Services hereunder (the "**Items**"), and (ii) notify the Company immediately of any such loss or damage to the Items.

8.2.3.   The Service Provider shall be liable for any loss or damage to the Items, excluding any normal wear and tear that occur in the ordinary course of business.

8.2.4.   Upon Company's request and in the event of any expiry or termination of this Agreement, the Service Provider shall return:

  (i)    all documents, in particular all materials and documents concerning trade secrets and other business information (including but not limited to databases, lists, information and documents pertaining to the Company's customers and / or Company's employees) that was prepared, gathered or obtained during the term of this Agreement or in connection with or during the performance of the Services, including any copies thereof, as well as records on other electronic data carriers;
  (ii)   unused materials, and
  (iii)  Entrusted Tools and other Items received from the Company in connection with the performance of the Services hereunder and shall provide a written statement in which he accounts for the materials used hereunder.

## 9.   CONFIDENTIALITY

9.1.  In connection with the performance of Services hereunder, the Company may disclose to the Service Provider, or the Service Provider may have access to Company's Confidential Information. As used herein, the term "**Confidential Information**" shall mean any and all proprietary or confidential information, whether or not developed by the Service Provider, including, without limitation: (i) any and all software programs, derivative works, products and other results of the Services performed by Subcontractor under this Agreement (together the "**Work Product**"); (ii) any and all technical information of the Company or its customers, including, without limitation, product data and specifications, requirements, methodologies, tools, know-how, formulae, the source code, and other software information, processes, inventions, research projects, and product development; (iii) any and all business information of or relating to the Company or its customers that is not known to the general public, including, without limitation, accounting and financial information, sales and marketing information, research, investment analyses, investment strategies and techniques, investment transactions and holdings, clients, personnel, shareholders, and information concerning "know-how" and information, data and material used or licensed by the Company or its customers, including, but not limited to computer software, programming, research, financial information and analyses, and the like documentation relating thereto; (iv) any and all employee information of the Company; (v) confidential information disclosed to the Company by any third party, including its customers to which the Service Provider has access to; and (vi) any personally identifiable information relating to the Company and its customers as made available during the performance of Services hereunder. Service Provider acknowledges and agrees that the Confidential Information constitutes valuable trade secrets of the Company or its customers, as the case may be.

9.2.  The Service Provider shall not disclose any Confidential Information to any third party, nor shall use any Confidential Information for any purpose other than for the performance of Services for the Company. All materials furnished to the Service Provider by the Company shall be considered Confidential Information, shall remain the property of the Company and shall be returned to the Company promptly upon the expiry or termination of this Agreement or at Company's earliest request. Service Provider shall not copy, reproduce or appropriate for its benefit or the benefit of any third party, any of the Confidential Information. Service Provider further agrees that he/she shall execute and deliver such additional confidentiality agreements as may be reasonably required by Company's suppliers or customers with respect to Service Provider's assignments that may expose Service Provider to the confidential information of Company's suppliers or customers

9.3. Service Provider's obligations under this Clause 9 will continue for each item of Confidential Information until such time as Service Provider can show that such item of Confidential Information (i) is or becomes publicly available other than as a result of any act or failure to act by the Service Provider; (ii) was known to the Service Provider, without an obligation to keep it confidential, prior to Service Provider's receipt of such item of Confidential Information from the Company or its customer; or (iii) has legally and properly been received by the Service Provider from a person other than the Company, through no breach of any agreement with the Service Provider or Company and without an obligation to keep it confidential.

9.4. <u>Personal Data</u>. The Service Provider shall process any personal information or sensitive personal data obtained in connection with the execution and performance hereof in compliance with Applicable Laws and regulations. The Service Provider undertakes not to disclose such personal data obtained from the Company to any third parties, including making the data available or entrusting them to third parties for processing, and to process the personal data obtained from the Company only within the scope and for the purpose required for the performance hereof.

9.5. The obligations of confidentiality set forth under this Clause 9 shall survive any expiry or termination of this Agreement for an indefinite period.

## 10. INDEMNITY

10.1. The Service Provider, at his expense, shall defend, indemnify and hold harmless the Company, its affiliates, directors, agents, employees and representatives (each an "**Indemnified Party**") from and against all actual claims, liabilities, expenses, costs, losses or damage of whatsoever nature (including reasonable attorneys' fees) which the Indemnified Party may suffer or incur, arising out of, in relation to or in connection with the following:

10.1.1. Any breach by the Service Provider of the terms and conditions under this Agreement;

10.1.2. Any violation of Applicable laws, fraud, negligence or misconduct by the Service Provider including without limitation in relation to the performance of Services hereunder;

10.1.3. Any infringement of Intellectual Property or proprietary right of any third party in relation to the Services rendered pursuant to this Agreement;

10.2. The indemnification rights of the Company under this Agreement are independent of, and in addition to, such other rights and remedies it may have under Applicable Laws or in equity or otherwise, including the right to seek specific performance, or other injunctive relief.

## 11. LIABILITY

11.1. In no event shall the Company be liable to the Service Provider or any other person for any indirect, special, incidental, exemplary, punitive or consequential damages arising out of, in relation to or in connection with this Agreement of any kind or nature whatsoever, whether in an action based on contract, warranty, strict liability, tort (including, without limitation, negligence) or otherwise, even if the Company has been informed in advance of the possibility of such damages or such damages could have been reasonably foreseen by the Company.

## 12. TERMINATION OF THE AGREEMENT

12.1. This Agreement may be terminated forthwith by the Company at any given point of time, by issuing a written notice:

12.1.1. If the Service Provider is in breach of the terms and conditions of this Agreement and the same is not remedied to the satisfaction of the Company within a period of 7 (seven) days from notice of such breach;

12.1.2. In case of any willful misconduct or gross negligence by the Service Provider in connection with the performance of Services and obligations under this Agreement during the Term; and

12.1.3. Any representation or warranty provided by the Service Provider is found to be incorrect; and

12.1.4. If the Service Provider is or may be in violation of any Applicable Law.

12.2. All obligations of the Parties under this Agreement shall cease from the date of any termination of this Agreement and the Service Provider shall be entitled to receive such Consultancy Fees, as due and payable, up to and through the effective date of such termination.

12.3. Upon any termination, the Service Provider shall immediately return to the Company (without retaining any copies or extracts thereof) any Confidential Information, Work Product and Intellectual Property and provide a written certification to that effect.

## 13. RESTRICTIVE COVENANTS

13.1. Service Provider agrees that during the Term of this Agreement and for a period of twelve (12) months thereafter, regardless of the reason for separation, Service Provider will not, directly or indirectly, on his or her own behalf, or on behalf of a third party:

13.1.1. Be employed by, perform any services for, do work under contract for, acquire an interest in, or become affiliated or connected with, any of the following Companies:[1];

13.1.2. Hire, offer to hire, entice away or in any other manner persuade or attempt to persuade any officer, employee or agent of Company or its affiliates to discontinue his/her relationship with Company;

13.1.3. Solicit any customers of the Company nor aid or assist any other person, firm, corporation or association in the solicitation of such clients when such solicitation is to obtain business or knowledge which pertains to the business of Company; and

13.1.4. Within India, where the Service Provider conducted any business during the Term of this Agreement or performed acts to own, manage, operate or control, or participate in the ownership, management, operation or control of, or be employed by or act as a consultant, advisor or independent contractor to, or be connected in any manner with any of the companies mentioned in Clause 13.1.1 above

## 14. GOVERNING LAW & JURISDICTION

14.1. This Agreement shall be governed in accordance with the laws of the state of Minnesota, USA without reference to the principles of conflicts of law.

14.2. Any dispute which may arise between the Parties concerning this Agreement shall be determined as provided in this Clause 14. For the purpose of this Clause, a dispute shall be deemed to have arisen when one Party serves on the other a notice in writing stating the nature of the dispute.

14.3. Unless this agreement has already been terminated by the date of the notice of dispute, the Service Provider shall, in every case, continue with the Services with all due diligence regardless of the nature of the dispute and the Company shall continue to make payments (excluding any disputed sums) in accordance with the Agreement.

14.4. After service of the notice of dispute, the following procedure shall be followed by the Parties (all periods specified in this Clause 14.2 shall be extendable by mutual agreement):

(a) within 7 days, the Service Provider and the Company Representative shall meet to attempt to settle the dispute;

---

[1] AirWatch (by VMWare), MobileIron, HEAT LanRev, FileWave, LANdesk, MaaS360 (by IBM), Parallels, ZuluDesk,

(b) if the Service Provider and the Company Representative are unable to reach a settlement within seven days from the date of service of the notice, executives of each of the parties shall meet within the following seven days to attempt to settle the dispute; and

(c) if no settlement results from the meeting specified in Clause 43.4(b), for the following 20 days the Parties shall attempt to settle the dispute by mediation by an independent mediator, with costs to be shared equally between the parties.

14.5.   If no settlement is reached under clause 14.2, each Party hereby submits itself for the sole purpose of this Agreement and any controversy arising hereunder to the exclusive jurisdiction of the federal or state courts located in the State of Minnesota and any courts of appeal therefrom and waives any objection (on the grounds of lack of jurisdiction, forum non-conveniens or otherwise) to the exercise of such jurisdiction over it by any such courts.

## 15.  NOTICES

15.1.   Any notice or other written communication given under or in connection with this Agreement may be delivered personally or sent by registered post or electronic mail or facsimile. The address for service of any Party shall be as set out below.

<u>If to the Company</u>:
100 Washington Avenue South, Suite 1100, Minneapolis, MN 55441 USA
Attn:  Legal Department

<u>If to the Service Provider</u>:
Address:
Contact Number:

15.2.   Any such notice or other written communication shall be deemed to have been served -

15.2.1.   If delivered personally to the relevant individual or to the address for the service, at the time of delivery;

15.2.2.   If posted, at the expiry of two business days or in the case of airmail four business days after it was posted;

15.2.3.   If by electronic email sent by email with confirmed receipt return email within 1 (one) business day, otherwise followed by either delivery options set out in this Clause 16.2.

## 16.  MISCELLANEOUS PROVISIONS

16.1.   <u>Amendments:</u> No amendment/modification of this Agreement shall be valid unless it is made by an instrument in writing and signed by duly authorized representatives of each of the Parties hereto or thereto. All legally required amendments shall automatically become an integral part of this Agreement. However, on such event so happening a written confirmation to that effect, duly executed by both the Parties shall be made out and attached to this Agreement and which shall form an integral part hereof.

16.2.   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

16.3.   <u>Entire Agreement:</u> This Agreement sets out the entire Agreement and understanding between the Parties with respect to the subject matter hereof. This Agreement supersedes all previous letters of intent, confidentiality agreements, heads of terms, prior discussions and correspondence exchanged between any of the Parties in connection with the subject matter hereof, all of which shall not have any further force or effect. This Agreement, together with the Schedules hereunder and such other attachments as by mutual agreement be made out and duly executed by both the Parties, is the entire

Agreement and expresses the complete, exclusive and final understanding of the Parties with regard to the subject matter herein and may not be altered, amended or modified except in writing and signed by the Parties.

16.4.   <u>Survival:</u> The terms and provisions of this Agreement that by their nature and content are intended to survive the performance hereof by any of all Parties hereto shall so survive the completion and termination of this Agreement.

16.5.   <u>No conflict</u>. Service Provider represents that his performance of all the terms of this Agreement and duties hereunder will not breach any agreements relating to invention assignment, confidential information, non-competition with any other party. Service Provider further represents that he will not bring to the Company or use in the performance of the Services any documents or materials of any other party that are not generally available to the public or which he does not have written permission to use in the course of performing his duties as a service provider hereunder.

16.6.   <u>Injunctive relief</u>. Service Provider hereby agrees that in the event of a breach or threatened breach of this Agreement, the Company will suffer irreparable harm and will be entitled to injunctive relief to enforce this Agreement.

16.7.   <u>Use of marks</u>. In connection with this Agreement, Service Provider will not use the Company's name in any form of publicity, or to release to the public any information relating to the work to be performed hereunder, or to otherwise disclose or advertise this Agreement, except under the following circumstances: (a) to provide specific information to existing or potential customers of the Company with regard to a possible engagement; (b) with the specific prior approval in writing from the Company; and (c) if required pursuant to any Applicable Law.

16.8.   <u>Assignment</u>. The Service Provider shall not assign or transfer any of his obligations and duties hereunder to any third party without the prior written consent of the Company.

16.9.   <u>Severability:</u> If any provision of this Agreement is or becomes invalid, illegal or unenforceable under Applicable Laws, then such provision shall (so far as it is invalid or unenforceable) be given no effect and shall be deemed not to be included in this Agreement but without invalidating any of the remaining provisions of this Agreement, which shall not in any way be affected or impaired. The Parties hereto shall then negotiate and replace the invalid or unenforceable provision with a valid and enforceable and mutually satisfactory substitute provision, achieving as nearly as possible the intended commercial effect of the invalid, illegal or unenforceable provision.

16.10.   <u>Further Assurances</u>: The Service Provider shall execute, acknowledge, prepare and deliver to the Company without additional compensation, any and all instruments or applications for securing, protecting or registering any property rights embraced within this Agreement.

**JAMF Software, LLC (Company):**

_____
Signature

     CFO
_____
Title

    June 18, 2020
_____
Date

**Service Provider:**

_____
Signature

Contractor Sales - India
_____
Title

06.04.20 (DD.MM.YY)
_____
Date

## SCHEDULE 1
## SERVICES

| Scope of the Services |
|---|
| The Service Provider shall provide the following Services: |
| 1. Work with Company's teams and personnel to develop Indian markets.<br><br>2. Service provider's variable fee is based on the total Indian ACV target<br><br>Q1: 260K<br>Q2: 252K<br>Q3: 250K<br>Q4: 230K<br><br><br>Variable Fee:  Upon achievement of the above targets Service Provider is eligible to earn up to $5,110.9 in each quarter |

# Exhibit B



## AMENDMENT TO SERVICE AGREEMENT

This Amendment (the "**Amendment**") is entered into on 21 January 2021 (the "**Amendment Effective Date**") by and between JAMF Software, LLC, a Minnesota limited liability company having its principal place of business at 100 Washington Avenue South, Suite 1100, Minneapolis, MN 55401 and its affiliates ("**Jamf**") and Prakash Maharaj, an Indian citizen bearing permanent account number ALJPM8418Q, having place of business at Mumbai (India) ("**Service Provider**"). Jamf and Service Provider are referred to individually as a "**Party**" and collectively as the "**Parties**".

A.       WHEREAS Jamf and Service Provider entered into that certain Service Agreement dated and effective on 18 June 2020 for the provision of certain business development and sales services by Service Provider to Jamf as more particularly described therein (the "**Service Agreement**"); and

B.       WHEREAS the Parties hereto wish to amend certain terms of the Service Agreement only as set forth below;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, as of the Amendment Effective Date Jamf and Service Provider agree as follows:

1.       Unless specifically provided otherwise, defined terms used herein shall have same meaning as in the Service Agreement.

2.       Clause 6.1 of the Service Agreement shall be deleted in its entirety and replaced with the following:

"6.1     <u>Consultancy Fees</u>. As consideration for performing the Services hereunder, and beginning on 1 January 2021, the Company shall pay the Service Provider a monthly consultancy fee of USD $7,789.23 (US Dollars seven thousand seven hundred eighty-nine and twenty-three cents) (the "**Consultancy Fee**"). Service Provider shall also have the opportunity to earn additional variable compensation on a calendar quarterly basis provided he meets the quarterly objectives set forth on Schedule 1 as the same may be amended from quarter to quarter (the "**Variable Fee**"). The Parties agree that the performance objectives within Schedule 1 may be amended on a quarterly basis and may be documented via an email from Company to Service Provider documenting such objectives and a formal amendment to this Agreement will not be needed for each such quarterly target."

3.       Schedule 1 to the Service Agreement shall be deleted in its entirety and replaced with the following:

"                                                SCHEDULE 1
                                                SERVICES

| Scope of the Services |
| --- |
| The Service Provider shall provide the following Services:<br><br>1.  Work with Company's teams and personnel to develop Indian markets.<br>2.  Service provider's variable fee is based on the total Indian market ACV target:<br><br>    *Financial Quarter*   *Target*<br>    Q1 2021        US$ 377,150 ACV<br>    Q2 2021        US$ 551,000 ACV<br>    Q3 2021        US$ 490,200 ACV<br>    Q4 2021        US$ 676,400 ACV<br><br>**Variable Fee:** Service Provider is eligible to receive 1.5% of the ACV Bookings during a quarter. For ACV Bookings over 100% of the quarterly Target, Service Provider is eligible to receive 2.5% of the quarterly ACV Bookings. Example: If the Service Provider has ACV Bookings of $650,000 in Q2 2021, Service Provider would be eligible to receive 1.5% of $551,000 (100% of Q2 Target) + 2.5% of ($650,000 - $551,000) = total of $10,740. |



> **Variable Fee Review and Adjustment:** Jamf may conduct a review of Service Provider's Variable Fee and may adjust it if Jamf determines in its sole discretion that the Variable Fee is excessive or inappropriate under the circumstance.
>
> All Variable Fees will be determined and paid within Jamf's discretion. If the basis for paying a Variable Fee is adjusted, and Jamf determines that it has overpaid Service Provider, Service Provider must repay Jamf the overpayment of the Variable Fee within thirty (30) days of written notice from Jamf.
> "

4.  **Choice of Law, Jurisdiction and Venue**. This Amendment and any dispute or claim arising out of or in connection with it or its subject matter or formation (including any non-contractual disputes or claims) shall be governed by the laws of the state of Minnesota, USA, without regard to its conflict of laws provisions, and the Parties submit to the exclusive jurisdiction of the federal or state courts located in the State of Minnesota and any courts of appeal therefrom and waive any objection (on the grounds of lack of jurisdiction, forum non-conveniens or otherwise) to the exercise of such jurisdiction over them by any such courts. Notwithstanding the foregoing, Jamf may institute an action in a court of proper jurisdiction for injunctive relief at any time.

5.  **Unenforceability and Severability**. If any term or other provision of this Amendment is determined to be invalid, illegal or incapable of being enforced under any applicable rule of law or public policy, all other conditions and provisions of this Amendment shall nevertheless remain in full force and effect.

6.  **Miscellaneous.** Other than as modified in this Amendment, all other terms and conditions contained in the Service Agreement remain in full force and effect in accordance with their terms. If there is a conflict between this Amendment and the Service Agreement, the terms of this Amendment shall prevail. This Amendment and the Service Agreement between the Parties constitute the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior understandings regarding such subject matter, whether written or oral. No amendment or modification to the provisions of this Amendment will be binding unless in writing and signed both Parties. Any waiver by a Party of a breach of any provision of this Amendment will not operate as or be construed as a waiver of any further or subsequent breach. Provisions of this Amendment which by their nature are to be performed or enforced following any termination of the Service Agreement shall survive such termination. Jamf may assign this Amendment to an affiliate or in connection with a merger or the sale of substantially all of Jamf's assets. This Amendment will be binding upon and inure to the benefit of the Parties, their successors and permitted assigns. This Amendment may be executed in counterparts, which together constitute one binding agreement. Jamf reserves all rights not expressly granted to Service Provider under this Amendment.

7.  **Authority of Signatories.** Each Party signing this Amendment represents and warrants that he or she is duly authorized and has legal capacity to execute this Amendment.

8.  **Effective Date.** This Amendment shall be effective from the Amendment Effective Date and shall have no retroactive effect.

IN WITNESS WHEREOF the Parties hereto have executed this Amendment as of the Amendment Effective Date:

**JAMF Software, LLC**                                   **Service Provider**

Signature: _Jill Putman_                               Signature: _[signature]_

Name: Jill Putman                                      Name:   Prakash Maharaj

Title:  CFO                                            Title:   Regional Sales Manager - India

Date: 2/1/2021                                         Date:   21.01.21

Jamf Internal Account Reference:

# EXHIBIT C



**Acknowledgement Protecting our Jamfs: Jamf Code of Conduct, Protecting our Data aka Acceptable Use, Jamf Holding Corp. Insider Trading Policy**

I have read, reviewed, and understand the following polices; Protecting our Jamfs: Jamf Code of Conduct, Protecting our Data aka Acceptable Use, and Jamf Holding Corp. Insider Trading Policy.  I understand that there may be additional policies or laws specific to my consulting services for Jamf Holding Corp.  I agree to comply with the following; Protecting our Jamfs: Jamf Code of Conduct, Protecting our Data aka Acceptable Use, and Jamf Holding Corp. Insider Trading Policy.

If I have questions concerning the meaning or application of any of the above listed Jamf Holding Corp. policies or procedures, or the legal and regulatory requirements applicable to employment at Jamf Holding Corp., I know that I can consult with Jamf Holding Corp.'s General Counsel, knowing that my questions will be maintained in confidence, consistent with applicable law.

**Please sign**

Print Name

Prakash.Maharaj@jamf.com

Signature



Date

02/04/2022



**NON-DISCLOSURE AGREEMENT AND IP ASSIGNMENT**

This **NON-DISCLOSURE AGREEMENT AND IP ASSIGNMENT** ("Agreement") is entered into this 02/04/2022 by and between JAMF Software, LLC ("Company") and _____ ("Service Provider").

RECITALS:

WHEREAS, Company is engaged in a highly competitive business in which it has developed proprietary software products, a system of suppliers, a network of resellers and channel partners, and unique consulting services to meet the needs of its customers;

WHEREAS, Service Provider may have access to unique and valuable information regarding the Company and its customers, including, without limitation, the Company's system of suppliers, customer lists and other accumulated valuable information; and customer lists and accumulated valuable information about its customers, the market area it serves, the computer industry, and software applications and demands, which information and systems are proprietary to Company; and

WHEREAS, Service Provider understands that the unauthorized use or disclosure of that information would be extremely harmful to the Company and that Service Provider's contractor duties or continued relationship with the Company is expressly conditioned on Service Provider's agreement not to disclose or use that information.

NOW THEREFORE, in consideration of Service Provider's contractor duties with the Company, Service Provider's access to the Company's confidential information and materials, the remuneration now and



hereafter paid to Service Provider, and other good and valuable consideration actually received by Service Provider in connection with signing this Agreement, the Service Provider agrees to fully and faithfully uphold and discharge all of the terms, provisions, and conditions of this Agreement as follows:

1. Confidential Information. Service Provider acknowledges that, during the course of his/her contract, Service Provider may produce and have access to Confidential Information, as defined herein, regarding the Company and its customers and affiliates. Accordingly, during and at any time subsequent to the termination of this Agreement, Service Provider shall hold in confidence and not directly or indirectly disclose, use, copy or make lists of any such Confidential Information, except to the extent authorized in writing by the Company, or as required by law or any competent administrative agency oras otherwise reasonably necessary or appropriate in connection with the performance by Service Providerof his/her Services for the Company. Upon termination of Service Agreement for any reason, Service Provider shall promptly deliver to the Company (i) all computers, zip drives, storage devices, iPhones, iPads, access to Company's social media accounts, personal data devices, records, manuals, books, documents, letters, reports, data, tables, calculations and all copies of any of the foregoing which are the property of the Company or which relate in any way to the customers, business, practices or techniques ofthe Company; and (ii) all other property of the Company and Confidential Information which in any of these cases are in Service Provider's possession or under Service Provider's control. Service Provider agrees to abide by the Company's reasonable policies as in effect from time to time, respecting avoidanceof interests conflicting with those of the Company.

For purposes of this Agreement, "Confidential Information" shall mean information relating to thebusiness, products, and affairs of Company, its affiliates, and its customers, from which Company derivesbenefit or economic gain and is not known publically or the public disclosure, unauthorized use or disclosure of which would harm the Company, including, without limitation, information about orrelating to the following: trade secrets; the identity, business, and needs of the Company's customers; the identity of and plans for the development of new customers by the Company; the business and pricing policies and practices of the Company; the financial condition and affairs of the Company; the Company's business development activities and plans for its existing and prospective lines of business, products, and services; the identity of and nature and terms of Company's business relations withcustomers, vendors, lenders, independent contractors and employees; any data or information that concerns any software development or coding performed by Company; marketing and sales strategies of the Company; Company's designs, computer software and databases, systems, methods, programming materials, processes, new and developing products, services, and promotion campaigning concepts; socialmedia accounts related to the Company's business; form documents including quotes, invoices and purchase order; or any other confidential, proprietary or secret information concerning the business and affairs of Company or any of its affiliates. Confidential Information shall not include information or property which is: (i) now in the public domain or later publicly available through no fault of Service Provider; (ii) known to Service Provider prior to Service Provider's receipt of the same from or through Company; or (iii) rightfully obtained by Service Provider from sources other than Company.

Service Provider further agrees that he/she shall execute and deliver such additional confidentiality agreements as may be reasonably required by JAMF's suppliers or customers with respect to Service Provider's assignments that may expose Service Provider to the confidential information of JAMF's suppliers or customers.

2. Non-Disclosure. Service Provider agrees that during the term of his/her association with Company, and at all times thereafter, he/she will use or not directly or indirectly make known or divulge the Company's Confidential Information to any others except as required or permitted by Company in the course of its business and Service Provider further agrees that upon termination of his Service Agreement, regardless



of who initiated the termination, Service Provider will return to the Company all Confidential information, on any medium whatsoever, and all other property of the Company or Company's clients.

3. Work For Hire. Service Provider acknowledges that all Work Product, as defined below, created during Service Provider's contracted time with the Company is a "work made for hire" as defined by U.S. copyright laws, and is owned by the Company. Work Product includes, without limitation, all discoveries, inventions, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable or protectable by copyright or other intellectual property law. To the extent any Work Product does not constitute a "work made for hire" within the meaning of U.S. copyright laws, Service Provider hereby sells, transfers, and assigns unto Company any and all right, title, and interest in and to the Work Product, including, without limitation, any and all rights to apply to register any of the foregoing, all rights to causes of action and remedies related thereto including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of any rights related to the foregoing, and any other rights and interests arising out of, in connection with, or in relation to the Work Product, all in perpetuity throughout the World. Service Provider further irrevocably waives any and all rights of attribution and any and all moral rights related to the Work Product to the greatest extent allowed by law. Service Provider agrees to execute all documents, papers, forms and authorizations and take all other action that may be necessary for securing, completing, or vesting in Company full right, title, and interest in and to the Work Product.

Any provision in this Agreement requiring Service Provider to assign his/her rights to any Work Product does not apply to inventions which qualify for exclusion under Minnesota Statute § 181.78. That section provides that the requirement to assign "does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the Service Provider's own time, and (1) which does not relate (a) directly to the business of the Company or (b) to the Company's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the Service Provider for the Company." Service Provider understands that it is Service Provider's obligation to promptly disclose (i) any Work Product that Service Provider created prior to his/her contracted time with the Company that Service Provider believes should not be subject to this Agreement; and (ii) any Work Product that Service Provider created during his/her contracted time with the Company that Service Provider believes should not be subject to this Agreement.If Service Provider does not promptly disclose any Work Product that Service Provider believes should not be subject to this Agreement, Service Provider acknowledges that such non-disclosure will beconsidered a representation that he/she has created no such Work Product prior to signing this Agreement,and that, during the course of Service Provider's relationship with the Company, Service Provider createdno such Work Product.

4. Prior Works. Contemporaneously with the execution of this Agreement, Service Provider agrees that he/she shall execute and deliver the Intellectual Property Rights Assignment in the form attached hereto as Exhibit A.

5. Enforcement. Service Provider understands and agrees that in the event Service Provider violates any provision set out herein, Company shall suffer irreparable damage and shall be entitled to full injunctive relief or such other relief against Service Provider as may be provided by law or in equity together with such real and punitive damages as may be provided at law or equity. If at the time of enforcement of the breach of any provisions of this Agreement a court should hold that the period, scope or geographical area restrictions stated are unreasonable under the circumstances, then the maximum periods, scope or geographical area as determined to be reasonable shall be substituted for the stated period, scope or geographical area. In the event of a breach by Service Provider, Company may, in addition to any other rights or remedies existing in its favor: (a) apply to any court of law or equity of competent jurisdiction



for specific performance and/or injunctive or other relief in order to enforce or prevent violations of this Agreement, or (b) require Service Provider to account and pay over to Companyall compensation, profits, monies, or other benefits derived or received by Service Provider as a result of the breach by Service Provider of this Agreement. The rights and remedies enumerated shall beindependent of the other and shall be severally enforceable.

6. Applicable Law. The parties agree that this Agreement will be enforced pursuant to the applicable laws of the state of Minnesota and the United States.

7. Severability/Immunity Notice. In the event that any provision of this Agreement is invalid or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. Notwithstanding any language in this Agreement to the contrary, Service Provider shall not be held criminally or civilly liable under any Federal or State trade secret law for disclosure of a trade secret that is made: 1) in confidence to a Federal, State or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; or 2) in a complaint or other document filed in a lawsuit or other proceeding if such filing is made under seal; or 3) to Service Provider's attorney if Service Provider files a lawsuit for retaliation for reporting a suspected violation of the law, or made in such court proceeding, if the individual files any documents containing the trade secret under seal and does not disclose the trade secret except pursuant to court order. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed under the aforementioned statute.

8. Entire Agreement. This Agreement and the attached Intellectual property Rights Assignment set forth the entire agreement of the Parties concerning the subject matter hereof and supersedes and replaces any and all other agreements or understandings, written or oral, between the Parties concerning the subject matter hereof; *provided, however*, this Agreement does not supersede or replace any covenants of non-competition or non-solicitation between the parties, which prior covenants remain unaffected by this Agreement.

**JAMF Software, LLC**

Signature:

Name: Jeff Lendino

Title: General Counsel

**Service Provider**

Signature:

Name: Prakash.Maharaj@jamf.com

Title: RSM- India

02/04/2022

# EXHIBIT A

## INTELLECTUAL PROPERTY RIGHTS ASSIGNMENT : 02/04/2022

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, ("Assignor"), hereby agrees that any and all computer code, works of authorship,

DocuSign Envelope ID: 6A85F408-65D9-424A-BF96-73B48DD1DB52



copyrights, copyright registrations, copyright applications, inventions, and patents, together with all adaptations and derivative works thereof that Assignor has created, made, or invented on behalf of or for the benefit of JAMF Software, LLC, a Minnesota limited liability company ("Assignee") on or prior to the date hereof (the "Works") shall be considered "work made for hire" within the meaning of the United States Copyright Act, 17 U.S.C. § 101, and all right, title, and interest in and to all Works shall be exclusively owned by Assignee. To the extent any Works do not constitute a "work made for hire" within the meaning of the United States Copyright Act, Assignor hereby sells, transfers, and assigns unto Assignee any and all right, title, and interest in and to the Works, including, without limitation, any and all rights to apply to register any of the foregoing, all rights to causes of action and remedies related thereto including, without limitation, the right to sue for past, present or future infringement, misappropriation, or violation of any rights related to the foregoing, and any other rights and interests arising out of, in connection with, or in relation to the Works, all in perpetuity throughout the World. Assignor further irrevocably waives any and all rights of attribution and any and all moral rights related to the Works to the greatest extent allowed by law. Assignor agrees to execute all documents, papers, forms and authorizations and take all other action that may be necessary for securing, completing, or vesting in Assignee full right, title, and interest in and to the Works. Assignor represents and warrants that Assignor has full power to enter into and perform this Assignment and that Assignor has not granted to any person or entity any interest in the Works.

**IN WITNESS WHEREOF**, Assignor has executed this Intellectual Property Rights Assignment as of the date stated above.

**ASSIGNOR:**

[Full Name]

Signature:

12004541v2