**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| JAMF SOFTWARE, LLC, a limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>PRAKASH MAHARAJ, an individual and KANDJI, INC., a corporation.<br><br>Defendants. | Case No. |

**DECLARATION OF ELIZABETH BENZ**

NOW COMES ELIZABETH BENZ who deposes and says:

1. I am over eighteen (18) years of age, legally competent to give this declaration, and have personal knowledge of the facts set forth herein.

**Elizabeth Benz's Employment With Jamf**

2. I serve as Chief Sales Officer for Jamf and have held this role since July of 2023. In this role I am responsible for Jamf's worldwide sales and directing the leadership of Jamf's global revenue organization in the US, Europe, Latin America, and Asia (which includes India).

3. I've worked for Jamf for over six (6) years and during this time have held other roles including: Senior Vice President of Revenue, Sales and Senior Vice President of Revenue – Sales and Customer Success.

**Jamf's Business**

4. Jamf was founded in 2002. It develops, markets, and sells products and services designed to provide IT administrators the necessary resources to manage, secure, and protect Apple

products. Though its headquarters is in Minneapolis, Minnesota, Jamf conducts business worldwide.

5. Among other products, Jamf produces Jamf Pro, a mobile device management (MDM) software that enables IT departments to secure, control, monitor, and manage end-user Apple devices. Jamf Pro is a full-solution MDM system for Apple's range of products, including Mac, iPad, iPhone, and Apple TV. It allows IT departments to enable devices in-house, remotely, or through end user initiation. The software system allows IT departments to easily disseminate software, management profiles, and content to end users and offers remote and automated security protocols. It also offers analytics and reporting features to ensure the system works optimally and to allow IT departments to detect potential problems before they arise. Additionally, Jamf offers a suite of security products designed to enable businesses to protect and secure both Mac and iOS devices from cyber threats.

6. Jamf is the leading provider of software for the Apple ecosystem serving organizations across the world. As of 2023, Jamf has 73,500 customers and over 31.3 million Apple devices under management.

**Jamf's Trade Secrets**

7. The software market for supporting and securing Apple devices is highly competitive. A fundamental and important part of Jamf's business therefore involves the creation, development, and maintenance of confidential and proprietary information regarding both Jamf's business – *i.e.*, its operations, the specialized services it provides to its customers, its software – and its customers. Jamf's ability to identify the needs and preferences of existing and prospective clients, and to deliver products and services catering to those needs and preferences, is critical to maintaining its business and growing it globally. As a result, Jamf has invested an enormous

amount of money, time, and energy in identifying and evaluating clients and prospects, as well as developing and customizing products and services for those clients and prospects.

8. Jamf employs a large, well-trained sales force to seek out and secure new business and to service existing clients. In the course of dealings with clients and prospective clients, Jamf obtains valuable information, including how its clients and prospective clients operate, the identity and contact information for key client personnel, contract expiration and renewal dates, terms for contracts and proposals, price points for contract renewals, and product and service needs and preferences.

9. Based on this information, Jamf develops, analyzes, and compiles various internal strategies and information, including, but not limited to, Jamf's marketing and business strategies, business leads and opportunities, sales and related financial data, proprietary pricing information, product specifications and functionality, work-around issues with Jamf's products and services, test case documents, and employee and contractor contact information.

10. This client and prospective client and other proprietary information are maintained by Jamf on secure databases including a Salesforce database.

11. Among the highly confidential and proprietary trade secrets on Jamf's secure databases is the identity and contact information for prospective and existing clients; detailed terms for contracts and proposals; contract expiration and renewal dates; sales quotes; pricing and discounting information; price points for contract renewals; client-specific needs and preferences, including work-around issues; marketing and business strategies; business leads and opportunities; sales and related financial data; cost of goods information; product specifications and functionality, including specific issues and concerns with product functionalities and services, as well as related workaround and troubleshooting information; and supplier and consultant contact information.

12. The secured databases also contain an opportunities section detailing what various clients are looking to purchase, product lists, sales stage history, and leads (new, current, or prospective customers); special pricing requests regarding Jamf products and services, including instances where a discount or rebate may have been given; and forecasts, dashboards, and reports, though which Jamf's sales representatives or managers can view forecasts and run sales reports.

13. The proprietary information contained on Jamf's secured databases related to pricing, customers, and business strategy are considered the "crown jewels" of Jamf's sales team worldwide.

**Jamf's Indian Operations**

14. Jamf's global reach has expanded over time thanks both to the superiority of its products and services and also strategic business initiatives. The latter includes identifying and investing in key emerging markets, most recently in India, the Middle East, and Africa. In particular, Jamf identified India as being ideally suited for significant investment due to its large population and maturing economy.

15. Jamf made a strategic decision to invest in India for a variety of reasons including: Jamf client demand, the fact that India is a hub for technology businesses and development, and Apple's success in the territory.

16. Jamf kicked off its efforts to grow the Indian market in 2018. It has spent the five years since developing relationships with resellers, end consumers, private businesses, and governmental entities in the country. To do so, Jamf hired a team of sales contractors to begin marketing and selling Jamf's products and services in the country.

17. The market for software is extremely competitive and the products and services technologically complex. Thus, individuals who sell the software must not only be skilled

salespeople, but they must also have significant technical knowledge. Because of the deep sales and technical knowledge that software salespeople must have, Jamf devotes extensive time, effort, and expense to training and supporting its sales professionals, including Mr. Maharaj, so they can successfully market and sell Jamf's products and services.

18. Jamf provided the following training related to sales strategies, confidentiality, and information security to its Indian contractors, including Mr. Maharaj:

a. SDR Privacy Training
b. Security Industry Basics
c. Selling Security Training Series
d. Information Security Awareness
e. Apple Enterprise Management
f. Global Data Privacy
g. Annual training on protecting Jamf's confidential information entitled "Protecting Our Data," which Mr. Maharaj took on five separate occasions.
h. Jamf certification courses, such as Jamf 100, Jamf 200, Jamf 300, and Jamf 370, all of which Mr. Maharaj attended.

19. Jamf's efforts to expand its business in India have been wildly successful. Its revenues in the country have grown ten-fold since 2019 prior to Mr. Maharaj joining Kandji as its first representative in the country.

20. Based on the successes of its five-year efforts in India, Jamf officially launched Jamf India Private Limited ("Jamf India") – its Indian entity – on August 1, 2023.

**Mr. Maharaj's Tenure with Jamf**

21. Mr. Maharaj was initially retained by Jamf as a service provider in or about November 2018. Mr. Maharaj was the first salesperson Jamf retained in India and it quickly grew to a team of twenty in fewer than five years. Jean-Francois Lesseliers, Jamf's Director, Regional

Sales, supervised Mr. Maharaj and the remainder of the team from Jamf's offices in Amsterdam, the Netherlands.

22. As a salesperson, Mr. Maharaj was responsible for marketing Jamf's MDM and security software products and services to commercial and government entities in India. He also provided sales support for Jamf sales efforts in the Middle East.

23. Mr. Maharaj was eventually promoted to Regional Sales Manager of India. As Regional Sales Manager of India, Mr. Maharaj supported Jamf sales to all industry markets and customers in India. His prior approval was also necessary to provide price discounts to customers, so he had detailed knowledge of Jamf's pricing strategy, discounts, and customer history. He served in this role until January 2023. At that time, he began transitioning to Jamf's Education Sales Manager, India and Middle East/Africa. This job title was scheduled to become official when Jamf India officially launched.

**Mr. Maharaj's Contractual Obligations**

24. As a result of his position(s) with Jamf, Mr. Maharaj was given access to Jamf's confidential and proprietary information stored on secured systems.

25. On October 19, 2018, and later on June 4, 2020, as part of his relationship with Jamf and for the specific purpose of safeguarding Jamf's confidential, proprietary, and trade secret information and materials, and also its goodwill, Mr. Maharaj entered into a Service Agreement. The Service Agreement was later amended again in February 2021.

26. Under the Service Agreements, and in exchange for his access to Jamf's confidential Salesforce Database and other trade secret information, his continued relationship with Jamf, and other benefits, Mr. Maharaj agreed that he would "at all times act in the best

interests of the Company" and that he would "not engage in any acts or deeds such that would be detrimental to the interests of the Company."

27. Each time Mr. Maharaj was asked to execute a new agreement or amendment he was provided with increased compensation.

28. Mr. Maharaj also agreed that Jamf's trade secrets, confidential information, and other proprietary information, which he would be (and was) given access to included but was not limited to the following information:

> (i) Any and all software programs, derivative works, products and other results of the Services performed by [you] under this Agreement...
>
> (ii) Any and all technical information of the Company or its customers, including, without limitation, product data and specifications, requirements, methodologies, tools, know-how, formulae, the source code, and other software information, processes, inventions, research projects, and product development;
>
> (iii) Any and all business information of or relating to the Company or its customers that is not known to the general public, including, without limitation, accounting and financial information, sales and marketing information, research, investment analyses, investment strategies and techniques, investment transactions and holdings, clients...and information concerning "know-how" and information, data and material used or licensed by the Company or its customers, including, but not limited to computer software, programming, research, financial information and analyses, and the like documentation relating thereto;
>
> (iv) Any and all employee information of the Company;
>
> (v) Confidential information disclosed to the Company by any third party, including its customers to which [you] ha[ve] access to; and
>
> (vi) Any personally identifiable information relating to the Company and its customers as made available during the performance of Services hereunder.[1]

29. In the Service Agreement, Mr. Maharaj acknowledged and agreed that "the Confidential Information constitutes valuable trade secrets of the Company or its customers, as the

[1] The 2018 and 2020 Service Agreements contain identical confidentiality obligations.

case may be." He further agreed not to disclose any of this information to any third party and also not to use any of it "for any purpose other than for the performance of Services for the Company." Mr. Maharaj also agreed to return all such information to Jamf promptly upon termination of the Agreement and acknowledged his confidentiality obligations would survive termination of the Agreement.

30. Mr. Maharaj agreed that in the event of a breach or threatened breach of the Service Agreement, Jamf would "suffer irreparable harm and will be entitled to injunctive relief to enforce this Agreement."

31. Additionally, Mr. Maharaj agreed that the Service Agreement(s) would be governed by Minnesota law and to submit any dispute or controversy arising thereunder to "the exclusive jurisdiction of the federal or state courts located in the State of Minnesota...and waives any objection (on the grounds of lack of jurisdiction, forum non-conveniens or otherwise) to the exercise of such jurisdiction over it by any such courts."

32. Mr. Maharaj reaffirmed those commitments when executing a Non-Disclosure Agreement and IP Assignment ("NDA") on February 4, 2022. Like the Service Agreement(s), the NDA contains prohibitions against Mr. Maharaj's unauthorized retention and use of Jamf's confidential information both during and after termination of the parties' relationship.

33. Specifically, the NDA provides that upon termination of the Service Agreement for any reason, Mr. Maharaj shall promptly deliver to the Company:

> all computers, zip drives, storage devices, iPhones, iPads....records...documents, letters, reports, data, tables, tables, calculations and all copies of any of the foregoing which are the property of the Company or which relate in any way to the customers, business, practices or techniques of the Company; and
>
> all other property of the Company and Confidential Information which in any of these cases are in [Mr. Maharaj's] possession or under [his] control.

34. Like the Service Agreement(s), the NDA defines "Confidential Information" as information relating to the "business, products, and affairs of the Company, its affiliates, and its customers, from which [Jamf] derives benefit or economic gain and is not known publically…unauthorized use or disclosure of which would harm the Company…." The NDA further defines this information as including, but not limited to

> the identity, business, and needs of the Company's customers; the identity of and plans for the development of new customers by the Company; the business and pricing policies and practices of the Company; the financial condition and affairs of the Company; the Company's business development activities and plans for its existing and prospective lines of business, products, and services; the identity of and nature and terms of Company's business relations with customers, vendors, lenders, independent contractors and employees; any data or information that concerns any software development or coding performed by the Company; marketing and sales strategies of the Company; Company's…computer software and databases, systems, methods, programming materials, processes, new and developing products, services, and promotion campaigning concepts…form documents including quotes, invoices and purchase order.

35. Under the NDA, Mr. Maharaj also agreed that during the term of his association with Jamf, and all times thereafter, he would not use the confidential information on behalf of, nor divulge it to, any third-party except as required or permitted by Jamf. He agreed to return to Jamf all such information, on any medium whatsoever, when his relationship with Jamf concluded.

36. As with the Service Agreement(s), Mr. Maharaj agreed that to "enforce or prevent violations" of the NDA, Jamf may apply to a court of competent jurisdiction for, among other things, injunctive or other relief…" or require him to "account and pay over to [Jamf] all compensation, profits, monies, or other benefits derived or received by [Mr. Maharaj] as a result of the breach…."

37. Finally, he agreed the agreement would be governed by Minnesota law.

**Jamf's Direct Competitor Kandji Courts Mr. Maharaj**

38. In January 2023, Mr. Maharaj notified his supervisor, Mr. Lesseliers, that Kandji had contacted him on LinkedIn to discuss becoming its first salesperson in India.

39. In April 2023, Mr. Maharaj informed Mr. Lesseliers that he was no longer discussing potential employment with Kandji. As Jamf would later learn, Maharaj's assurance was false.

40. I am aware that Jamf was alerted to the fact that Kandji was courting Mr. Maharaj by a colleague who works with one of Jamf's largest business partners. The colleague forwarded an email to Jamf that he had received from Steve Sutcliffe, a Vice President for Kandji. In the email, Mr. Sutcliffe mentioned that Kandji was in discussions with Mr. Maharaj concerning his potential to be its first employee in India.

41. At the end of June 2023, Jamf provided Mr. Maharaj – and its other sales contractors in India – with a written offer of employment with Jamf India Private Limited in the form of a proposed employment agreement. Mr. Maharaj's contract with Jamf was scheduled to conclude on July 31, 2023, and under the proposal, his employment with Jamf India would commence on August 1, 2023.

42. However, on July 7, 2023, Mr. Maharaj notified Jamf that he was declining Jamf's offer of employment, meaning the parties' relationship would terminate on July 31, 2023.

43. On August 3, 2023, Mr. Maharaj e-mailed Mr. Lesseliers and confirmed that he had accepted a position with Kandji as its Sales Director for India, a role that was substantially the same position that he had previously held with Jamf.

44. Jamf and Kandji are direct, head-to-head competitors.

45. Adam Pettit and Mark Daughters, CEO/Founder and Head of Workplace respectively, are well-known to Jamf. Both were originally introduced to Jamf when they were

part of Interlaced, LLC a firm founded by Mr. Daughters that was a sales partner of Jamf starting in 2015. During this time Messrs. Daughters and Petit became familiar with Jamf's markets, approach to customer relations, sales strategies, and its way of doing business with its partners. In late 2018, the two founded Kandji. Initially, Kandji was a bare-bones product focused merely on checking device profiles against known security baselines. Later, in 2019, Kandji attempted to build a more full-fledged MDM product, thus entering direct competition against Jamf. Since that time, Kandji appears to have endeavored to grow its business by following Jamf to various emerging markets and trying to mimic Jamf's business moves in those markets.

46. Unlike Jamf, however, Kandji has not had a presence in India the past five years. In fact, Mr. Maharaj is Kandji's first salesperson in the country.

**Maharaj's Misappropriation of Jamf's Confidential and Trade Secret Information**

47. I am aware that Jamf has conducted an internal investigation of Mr. Maharaj's devices because it suspected that Mr. Maharaj was downloading and exporting files and information. I am further aware that the investigation revealed that Mr. Maharaj in the days and weeks leading up to his separation from Jamf, he engaged in an unprecedent level of economic espionage and theft of trade secrets.

48. During his final contracted week of work (July 24, 2023, through July 28, 2023) Mr. Maharaj took PTO that he had saved up. However, during this PTO, Mr. Maharaj took Jamf 300, a Jamf certification course that provides users a deeper understanding of the macOs and iOS management capabilities within Jamf Pro. I am aware that while there was no substantive reason for Mr. Maharaj to partake in this Jamf course while on PTO and days before joining a competitor in Kandji. However, his actions while taking the course further highlight his intentional misappropriation of Jamf's confidential and trade secret information. Mr. Maharaj not only took

the course, but also took over 150 screenshots of the content, in direct violation of the Jamf's program's rules precluding participants from copying, recording, or reproducing any of the information or materials utilized during the course.

49. However, Mr. Maharaj unauthorized copying or recording of the Jamf 300 course's content is not the extent of his misappropriation. I am also aware that in the month preceding his departure from Jamf to join Kandji, Mr. Maharaj downloaded a staggering and unprecedented amount of confidential and proprietary information related to Jamf's business, including information from its Salesforce Database without authorization.

50. Jamf's investigation revealed that on or about June 30, 2023, Maharaj created a folder he labeled "Transitioning out of Jamf." For the next month, he began transferring files to the folder and exporting the files from there to a personal USB drive.

51. I am aware that Jamf, through its investigation, discovered that Mr. Maharaj exported ***approximately 350,000 files*** from Jamf systems. Additionally, Jamf has discovered that during the same period, Mr. Maharaj took more than 650 screenshots, including Jamf's confidential and proprietary databases and exported the screenshots to his personal USB drive.

52. Leaving no doubt that what he was doing was unlawful, I understand that Jamf's investigation revealed that Mr. Maharaj first moved the files to a folder he created and labeled "Transitioning out of Jamf" folder before ultimately exporting the files to his personal USB drive. Moreover, the investigation revealed that Mr. Maharaj is believed to have executed an agreement to become Kandji's Sales Director of India on July 4, 2023, and that the vast majority of his unlawful misappropriation took place after that date.

53. Among the approximately 350,000 files illegally downloaded, exported, and retained by Mr. Maharaj are documents related to pricing information for customers, reports

regarding customers and their bookings, quotes for customers, and more highly sensitive Jamf business information.

54. The majority of the documents and information stolen by Mr. Maharaj, relate to specific clients, sales divisions, and proprietary pricing information, including, but not limited to the following files:

a. "Jamf Channel SKU 1002020203", documents containing targeted information about how Jamf prices and sells various products;
b. "Jamf Channel SKU 1002020103_001," same as above;
c. "Jamf Channel SKU 9001020099-C", same as above;
d. "Zoom Info Leads 2023 Q3", which is a list of Jamf's Q3 sales leads;
e. "Q3 India Security Open", which is a business pipeline list detailing open opportunities to sell Jamf security products;
f. "Q3 India All Open Opportunities", which is a list of all recent sales opportunities that Jamf is tracking in its India sales pipeline ;
g. "Q3 Marketing Plan Consolidation";
h. "India New Logo 2023," which is a list of Jamf's new customers;
i. "Contacts w email 2023", which is a list of customers;
j. "EMEIA Partner Contact List", which is a list of Jamf's business partners;
k. "India Customer Email Addresses";
l. "EMER EDU-Commit & Won" Report, which is a report showing the education customers that Jamf had recently won in its emerging markets; and
m. Various customer quotes.

55. The information contained within the materials stolen by Mr. Maharaj are incredibly important to Jamf's business success, its go-forward strategy in India and other emerging markets and are valuable to its competitors. This information has been gathered through the extensive effort and time that Jamf has spent cultivating the relationships with its customers in India and other emerging markets, in part through its retention of Mr. Maharaj and a substantial team of sales contractors in India across the past five years. The insight Jamf gains from its ongoing dealings with its customers (actual and prospective) is invaluable, as evidenced by the fact that Jamf's customer retention consistently exceeds 100%.

56. These documents are also valuable because they contain: the identity and contact information for prospective and existing clients, detailed terms for contracts and proposals, contract expiration and renewal dates, sales quotes, pricing information, price points for contract renewals, client-specific needs and preferences, including work-around issues, marketing and business strategies, business leads and opportunities, sales and related financial date, cost of goods information, product specifications and functionality, including specific issues and concerns with product functionalities and services, as well as related workaround and troubleshooting information, and supplier and consultant contact information.

57. Further, these documents and information are valuable to Jamf because they contain information about what various clients are looking to buy, product lists, sales stage history, and leads (new, current, or prospective customers) and special pricing requests showing Jamf products and services and instances where a discount may have been given, among other information.

58. The confidential and proprietary information contained in the documents that Mr. Maharaj stole is not generally known to the public or the industry in which Jamf operates. As a result, Jamf's competitors would obtain economic value from their disclosure or use. Simply put,

if a competitor was privy to this material, it would be at a significant advantage in the highly competitive MDM and security software market.

59. In the hands of a competitor, the customer and pricing information alone would be devastating to Jamf's operations. It would allow a competitor to easily identify customers in the market for the types of services provided by Jamf and Kandji and allow Kandji to outbid Jamf by knowing the exact pricing Jamf is charging customers.

**Maharaj's Post-Separation Usage of Jamf's Confidential and Trade Secrets Information to Solicit Customers**

60. Immediately after departing from Jamf, Mr. Maharaj began his employment with Kandji.

61. I am aware that Mr. Maharaj has used the information he stole to further Kandji's business interests in violation of his confidentiality provisions in the Service Agreement and NDA and the non-solicitation of customers provision in the Service Agreement.

62. For example, Mr. Maharaj called at least two customers to solicit their business for Kandji during the week of August 7, 2023. Both of these customers are in renewal negotiations with Jamf. When departing Jamf for Kandji, Mr. Maharaj was aware of these renewal negotiations, including Jamf's renewal strategy, the renewal terms offered by Jamf, and historical information Jamf had compiled regarding the customers. Importantly, these customers were included in a customer list that was downloaded and exported by Mr. Maharaj to his personal USB storage device, as were documents related to Jamf's strategy for renewal discussions with the customers.

63. I am also aware that Mr. Maharaj has begun soliciting prospective Jamf customers, with whom Jamf had been courting for many months. In fact, the group includes a customer Mr. Maharaj had even previously prepared a price quote on behalf of Jamf. This customer's

information, pricing, and preferences were included in the documents that Mr. Maharaj unlawfully downloaded and exported.

64. It is all but certain that Mr. Maharaj (and Kandji) is using the stolen information in aid of his efforts to solicit these customers on behalf of Kandji.

65. For example, Kandji recently won a new account by underbidding Jamf by only $1,000. Again, the documents that Mr. Maharaj stole included numerous documents on Jamf's pricing information for this prospective client, and it is not a coincidence that Kandji submitted a bid and won this account by such a small margin.

66. Though Jamf's investigation remains ongoing, it is aware that Mr. Maharaj misappropriated proprietary information related to at least 20 other customers.

67. While these are only some of the instances of customer solicitation that Mr. Maharaj has engaged in, it is undoubted that Mr. Maharaj has engaged in further customer solicitation in violation of his contractual and legal obligations and will continue to do so absent judicial intervention.

68. If unaddressed, Mr. Maharaj and Kandji's efforts will unquestionably do irreparable harm to Jamf's business and undo at least five years of work undertaken by Jamf to shape and develop its presence in India and other emerging markets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of August, 2023.

Elizabeth Benz